Jackson
v.
King

JACKSON, *ex. dem.* CADWELL AND OTHERS *against* KING
AND KING.

EJECTMENT, for lands in Washington county, tried before WALWORTH, C. Judge, at the July circuit in that county, 1823.

At the trial, it was admitted by the defendants' counsel, that Moses Cadwell, deceased, was seised in fee of the premises in question in his lifetime, and that the defendants were in possession of them at the time of suit brought.

The plaintiff then proved by Lucretia Cadwell, that 45 years before the trial, she was married to Cadwell, and had issue by him several sons and daughters, the lessors of the plaintiff; that Cadwell left her twenty-three years before the trial, and went off with one Elizabeth Healy, the wife of one Daniel Healy, with whom he lived till the time of his death, in November, 1821; that Elizabeth Healey had two daughters, Betsey and Lydia, who lived with Cadwell till they married; Betsey to James W. Smith, and Lydia to Henry K. Higgins.

The defendants then produced in evidence a deed of bargain and sale of the premises in question, executed by

*A voluntary deed is good as against the grantor's heir.*

*Where an act is sought to be avoided on the ground of mental disability, the proof lies with him who alleges it.*

*Till the contrary appears, sanity is to be presumed.*

*But after a general derangement is shown, it then is incumbent on the one who insists that the act was valid, to show sanity at the very time when it was performed.*

*What shall constitute that derangement,* or imbecility of mind which renders a party incapable of contracting.

Idiots and lunatics, or persons *non compos*, are of this description; and the disability is confined to these.

One *non compos*, is one who has wholly lost his understanding; and of such persons only, till since the revolution, did even the court of chancery entertain jurisdiction.

It does not follow that because, according to the modern doctrine of the court of chancery, one would be the proper subject of a commission in nature of a writ *de lunatico inquirendo*, that his acts are void or voidable in a court of law.

The question as to the validity of a deed executed prior to such a commission, would not be at all affected by it.

For, to affect a deed at the common law, an entire loss of the understanding must be shown. The common law has drawn no line to show what degree of intellect is necessary to uphold it.

Such a distinction shown to be impracticable.

But mere weakness of understanding is an item in the proof of fraud.

Against this, a court of equity will relieve, when it can be collected from the circum stances.

So will a court of law, where fraud is clearly established.

But courts of equity and law have not always concurrent jurisdiction in cases of fraud.

The distinction goes upon the kind and degrees of evidence.

*E. g.* at law, fraud must be proved, not presumed.

Whereas, in equity, it may be presumed, from the relative situation of the parties, inadequacy of price, want of correct information, &c.

Cadwell, being then a little more than 50 years of age, to James W. Smith, dated July 1st, 1816, expressed to be for the consideration of $2500, but a small part of which was actually paid ; also, a deed of bargain and sale of the premises in question, with full covenants, from Smith to the defendants, dated May 29th, 1819.

The only question upon the trial was, whether Cadwell, when he executed the deed to Smith, was of sufficient capacity to convey, the lessors of the plaintiff alleging that he was incompetent by reason of mental incapacity ; and the defendants denying the allegation.   To this question a great variety of evidence was heard, which I shall not recite ; because, for the purpose of presenting the legal questions in the cause, it is sufficiently detailed in the opinion of the Court.

Upon the question of incapacity, the Judge charged the jury, that to render the deed invalid, they must be satisfied that Cadwell was not in a situation to transact that particular business rationally ; not, on the one hand, that he should be capable of doing all kinds of business with judgment and discretion ; nor on the other, that he should be wholly deprived of reason, so as to be incapable of doing the most familiar and trifling work ; that if they were satisfied that his mind and memory were in such a situation, at the time of executing the deed, as to render him wholly incompetent to judge of his rights and interests in relation to that transaction, the deed was void ; and it was their duty to find a verdict for the plaintiff ; otherwise, to find for the defendant.

Under this charge, the jury found for the plaintiff.

*J. L. Wendell* moved for a new trial.   He contended that the Judge ought not to have submitted the general question of capacity or incapacity to the jury, at the time when the deed was executed ; but whether the bargainor came within a class of disqualifying cases known and defined by the law.   Being of full age, the grantor was of capacity to convey, unless he was *non compos*, that is to say, an idiot or lunatic.   One *non compos* is described by the law as one who never had reason, or who from some cause has totally lost it.

(2 Mad. Ch. 568, Am. ed. 1817, and the cases there cited. *In the Matter of Barker*, 2 John. Ch. Rep. 232, 236.) The jury should have been told so ; the nature of the incapacity required should have been pointed out to them ; and their attention drawn to the simple inquiry whether Cadwell, in point of fact, came within the legal description. Saying that he was not capable of conveying, because he was mentally incapable at the time, is laying down a new rule, which certainly is not sanctioned by authority. Till Barker's case, such a doctrine was unknown in this country, even in Chancery, upon the execution of a commission in nature of a writ *de lunatico inquirendo*, which admits a greater latitude of inquiry into mental capacity than was ever indulged by the more certain and rigid rules of the common law. These rules never pronounce a disqualification to be made out, until a complete deprivation of reason is clearly shown. (2 Mad. Ch. 572, Am. ed. 1817, and the cases there cited. 1 Harr. Ch. 738. *In the Matter of Barker*, 2 John. Ch. Rep. 236.) The case being put on this simple ground, a discreet jury cannot well err. But if the power to convey is to depend upon any degree of incapacity short of this, the title to real estate is left alarmingly insecure. In this case, the jury have set aside the deed upon a very slight balance of testimony, at the most, in favor of imprudence, partial loss of memory, childishness or folly. A large number of witnesses deny his incapacity. Nothing like a general derangement of mind was made out by the plaintiff. It was, therefore, not necessary for the defendants to call a single witness ; for the law always presumes sanity until general derangement is shown. ( *Van Alst* v. *Hunter*, 5 John. Rep. 158.)

But admitting the charge of the Judge to have been correct, the verdict is against the weight of evidence. (*Here the counsel went into the testimony at large.*)

*A. Spencer* (same side) would here apprise the opposite counsel of certain authorities which he should use in reply. As to the rules by which the Court would be governed in granting a new trial, *Bright* v. *Eynon*, (1 Burr. 390,) he said was a leading case. Ld. Mansfield there said, Erroneous

general verdicts, for which a new trial should be granted, mostly included legal consequences as well as propositions of fact. In drawing these consequences, the jury might mistake, and infer directly contrary to law; and he adds, that "the reasons for granting a new trial must be collected from the whole evidence; and from the nature of the case considered under all its circumstances." He also cited on the same subject, *Halsey* v. *Watson*, (1 Caines' Rep. 24.) *Jackson* v. *Sternbergh*, (id. 162.) *Jackson* v. *Laird*, (8 John. Rep. 489.) *M'Connel* v. *Hampton*, (12 John. 384.) *Wilkie* v. *Roosevelt*, (3 John. Cas. 206.) In the last case, he said, two new trials were successively granted, because the verdicts were contrary to evidence upon a question of usury.

To show that the deed was good as to the heirs, though voluntary, and that it was not within the statute against fraudulent conveyances, he cited *Jackson* v. *Garnsey*, (16 John. Rep. 189.)

Allowing the deed to be voluntary, or intended as a will, a greater degree of capacity is not necessary than would be required for the making a will. As to what this degree should be, writers have not drawn the line definitely; but a less degree of capacity than can be pretended from the evidence in this cause is sufficient. A good principle on this head is laid down in *Ex parte Holland*, (11 Ves. 11.) It is there said by the Ld. Chancellor, that the strongest mind may be reduced by the delirium of a fever, or any other cause, to a very inferior degree of capacity, which would yet admit of making a will.

In *Van Alst* v. *Hunter*, (5 John. Ch. Rep. 160,) a case where, as usual, the evidence differed upon the point of incapacity, the Chancellor said, "The control which the law gives to a man over the disposal of his own property, is one of the most efficient means which he has, in protracted life, to command the attentions due to his infirmities." And he goes on to examine the facts in reference to this proposition.

It is said in Swinburne on Wills, pt. 2, s. 4, "But if a man be of a mean understanding, neither of the wise sort nor of the foolish, but indifferent, as it were, betwixt a man and a fool yₐ. though he rather incline to the foolish sort, so that,

for his dull capacity, he might worthily be called *grossum caput*, a dull pate or a dunce; such an one is not prohibited to make a testament." At pt. 2, s. 5, it is said that old age is of itself no incapacity, unless it produce mere childishness or idiocy, as where the testator forgets his own name. In *Hawthorne* v. *King*, (8 Mass. Rep. 372,) the Court instructed the jury, "that if they should think that the testatrix, at the time of dictating the will, had sufficient discretion for that purpose; and that, at the time of executing the will, she was able to recollect the particulars she had so dictated, they might find her of sound and disposing mind and memory at the time of executing." In *Ex parte Cranmer*, (12 Ves. 445,) an inquisition was returned, that the person alleged to be lunatic, was "so far debilitated in his mind, as to be incapable of the general management of his affairs, &c." And in commenting upon this return, the Ld. Chancellor adverted to the delicacy of the question which might arise with reference to the liberty of the subject; and held it dangerous and improper to act upon such a return; and he asks, "how can I tell what is *so far* debilitated in his mind as not to be equal to the general management of his affairs?"

*D. Russell*, contra. This is a question between the heirs at law of Cadwell, and persons holding under a grant of land from him, without any thing like an adequate consideration, to one having no affinity with him. It was Cadwell's property; and unless disposed of understandingly, it passed to his heirs, the lessors. The motion is to set aside the verdict as contrary to evidence; and it is important to inquire, in the first place, what is necessary to deprive him of a disposing power? Technical idiocy or lunacy is not required. It is enough that he was in such a state of imbecility as not to be capable of acting under a proper apprehension of his rights and duties. To determine upon this position, we must look at the facts whence it is to be inferred. Whenever a case appears, upon which a Court of Equity would interfere, in order to prevent an act of delusion or folly, this Court will interpose and avoid the act, if it is completed. No matter in what cause the incapacity may originate, whether it be old age,

Jackson
v.
King.

intemperance or disease. There are various infirmities which may debilitate the human mind, upon which a Court of Equity will grant a commission of lunacy, with a view to prevent the alienation of property, much short of a positive and absolute deprivation of reason. We contend that the true inquiry is, would a Court of Equity, under the circumstances of this case, have thrown its protecting influence into the scale, had it been seasonably and properly applied to, against the grant in question? Would it not have placed Cadwell under the care of a committee? The evidence certainly shows great imbecility; and that a Court of Equity would so have done, we refer to *The Matter of Barker*, (2 John. Ch. Rep. 232, and the cases there cited.) The Chancellor says, "A Court of Chancery is the constitutional and appropriate tribunal, to take care of those who are incompetent to take care of themselves. There would be a deplorable failure of justice, without such a power. The object is protection to the helpless; and the imbecility of extreme old age, when the powers of memory and judgment have become extinct, seems as much as the helplessness of infancy, to be within the reason and necessity of the trust." The case was then put to the jury in a proper shape. Whether the rule cited, be ancient or modern, is immaterial; so long as it is a part of the law, it clearly exists. In Highmore on Lunacy, 101, Am. ed. 1822, it is said, "The faith of every contract, rests upon the capacity of the contracting parties." Was the grantor of sufficient ability to grant? Again, "It is of the essence of every contract, not so much that it is valid, as that the parties are in a sufficient capability to bind themselves; for every alienation of a man's right, all contracts between man and man, &c. ought to be done with sound judgment." (Id.) *Webster* v. *Woodford*, (3 Day's Rep. 90,) establishes the position once controverted, that "a man may show that he was *non compos mentis* in avoidance of his deed." A great variety of cases are there collected and discussed, applicable to the case under consideration. Lunacy once being established, Highmore gives the nature and extent of the returning reason, necessary to give effect to the act done. "Where the

existence of derangement is shown in general, the partiality of its operations, in the particular instance, should be manifestly and incontestibly proved, in order to prevent the application of its general effect." (Id. 102.) Again: 'General lunacy being established, the proof is thrown upon the party, alleging the lucid interval; and must establish a restoration of mind, sufficient to enable the party soundly to judge of his act." (Id. 123, 4.) There is hardly a case so bad, but that some witnesses may be obtained in favor of sanity.

*Wilkie* v. *Roosevelt*, is relied on as warranting a new trial. The difference is, that there was a case of palpable usury; but where the evidence is doubtful, Courts uniformly refuse to award a new trial. In *Walker* v. *Smith*, (4 Dall. 389, 391,) this was refused, though the Court were far from being satisfied with the conclusion, to which the jury had come, from the evidence. In *Wait* v. *M'Neil*, (7 Mass. Rep. 261,) the Court refused to do this, though the verdict was against the positive testimony of a witness, unimpeached, except from some slight circumstances, having a tendency to lessen his credibility, or showing that the witness might be mistaken. In *Hurtin* v. *Hopkins*, (9 John. Rep. 36,) the Court say they will not grant a new trial, when there is no other ground for the motion, than that the jury have misunderstood or disregarded the evidence, where the verdict is for the defendant in a penal action, or an action penal in its nature. They require evidence of partiality or corruption. (Opinions in the Mayor's Court, 12 & 13, S. P.)

*A. Van Vechten*, (same side.) Every application for a new trial is addressed to the discretion of the Court. It is not enough, that more light may possibly be elicited by a new trial: but the granting or refusing it must, in a great measure, depend on the particular circumstances of each case. This is Lord Mansfield's doctrine, and the doctrine of this Court. Admitting there may be doubt upon the facts, *cui bono*, a new trial? There is always a possibility, that a party may make out a better case, with a second chance. There is no material distinction, in this respect.

between actions of ejectment and other actions sounding in tort. The reason upon which some of the cases have excepted ejectment, as calling more emphatically for a new trial, is not very powerful ; for, though the possession is changed, a new action may be brought, by the losing party, and th: title tried *de novo ;* whereas, in other actions, the judg ment is final and conclusive. One would, therefore, suppose that the facilities for a new trial should be greater in the latter. I admit, that this is not a case of technical lunacy ; but it certainly presents the want of a sound disposing mind in Cadwell, which, according to Ld. Coke and other writers, and cases both ancient and modern, should avoid the conveyance.

[Both Mr. *Russell* and Mr. *Van Vechten* examined the evidence to this point, at large, in the course of their respective arguments.]

*A. Spencer,* in reply. I am sensible that where the verdict is merely against the weight of evidence, and the charge of the Judge is right, the leaning of the Court will be in favor of supporting the verdict : but in a mere question of property, if they perceive that the verdict is clearly against the weight of evidence, they will set it right. If they are satisfied that the jury have been excited by passion, led away by an appeal to their feelings, or misguided by prejudice, it is the duty of the Court to interfere and grant a new trial upon this ground. I was aware that in citing cases, and laying down rules from the books, I was saying nothing new : but the nature of the case requires that familiar principles should be adverted to ; for, while I admit in the language of the counsel on the other side, that the granting a new trial is a matter of discretion, depending in some measure on the circumstances of each case as it arises, I must be understood to mean a sound legal discretion, guided and controlled as far as possible by the books of authority. No heirs, or any body else, can call this act of giving the deed in question, if the grantor was capable of executing it ; and this involves an inquiry into the nature and extent of the capacity of which a grantor or devisor should be possessed. It is an

inquiry which has its bearing on all classes of society; and the Court will not forget that wills are generally made and valuable estates settled by persons *in extremis*, on their sick beds, or laboring under the weakness and imbecility of old age. These considerations are neither of them enough to invalidate the act. To say so, would be to impugn most wills or deeds in the nature of wills.

I referred to *Ex parte Holyland*, (11 Ves. 11,) and I beg leave to remind the Court again of what was said there by Ld. Eldon. A failure of memory is not a sufficient objection. If the testator is capable of doing an act of thought and judgment, it is enough. In *Van Alst* v. *Hunter*, (5 John. Ch. Rep. 148, 158,) the Court will find all the authorities to this point collected from the common and civil law. In that case the devisor's memory was extremely depreciated; and Chancellor Kent's remarks will be found directly applicable to the present case. He says, "the failure of memory is not sufficient to create the incapacity, unless it be quite total or extended to his immediate family and property. The Roman law (Code 6, 24, 14, and note 55) seemed to apply the incapacity only to an extreme failure of memory; as for a man to forget his own name—*fatuus præsumitur qui in proprio nomine errat*. The want of recollection of names is one of the earliest symptoms of a decay of memory; but this failure may exist to a very great degree, and yet 'the solid power of understanding' remain." I have greatly deceived myself, in the strictest examination I have been able to give this evidence, if, with respect to Cadwell, at the time he gave the deed in question, there was not as perfect an understanding, judgment and deliberation as in any common case. The burthen of showing a want of capacity lies upon the plaintiff; and if we can rebut his evidence by showing a general capacity, or a lucid interval accompanying the act, or sufficient mind in the bargainor to comprehend what he was doing, the case on the part of the defendant is made out. If we have succeeded in neutralizing the evidence, the conclusion of law is, that he was sane. He was only about 50 years of age, according to the testimony of Simpson; and if the plaintiff wished mental decrepitude to be inferred from old age, he

should have shown the bargainor to have been a much older man. None of the witnesses ascribe his failure of capacity to this cause; while, on both sides, they agree that he was an eccentric old man, fond of humor and calling men by strange names; (and he adverted to the outlines of the testimony.)

With regard to the general law, there is no difference between the counsel for the plaintiff and myself. At common law, always, a man must have mental capacity to convey. The only dispute between us is, as to the degree of capacity. I admit that this was the true question before the jury; that no technical disability need be shown. It is enough if soundness of mind and memory were wanting.

*Curia*, per WOODWORTH, J. If the deed from Cadwell to Smith is valid, the plaintiffs cannot recover. The execution appears to be sufficiently proved, by the subscribing witnesses; and there was an acknowledgment before a Master in Chancery. If voluntary, it is good between the parties; for the heir cannot set up the want of consideration in the deed from his ancestor. (16 John. 189.) But it is contended that Cadwell was *non compos*, or not of sound mind. The rule applicable to such cases is, that where the act of a party is sought to be avoided, on the ground of mental disability, proof of the fact lies upon him who alleges it, and, until the contrary appears, sanity is to be presumed. One of the qualifications of this rule is, that after a general derangement has been shown, it is then incumbent on the other side to show, that the party who did the act was sane at the very time when it was performed. (*Jackson* v. *Van Dusen*, 5 John. 159.)

The first question is, have the plaintiffs established the fact of general derangement, so as to impose on the other party the necessity of showing competency, or a lucid interval at the time the deed was executed? It becomes material to inquire what constitutes that derangement, or imbecility of mind, that renders a party incapable of contracting. Idiots and lunatics, or persons *non compos*, fall within this description. I apprehend the disability applies exclusively

to such. Lord Coke defines *non compos mentis,* "to be a person who was of good and sound memory, and by the visitation of God had lost it," or, "he that by sickness, grief, or other accident, wholly loseth his understanding." (*Beverly's case,* 4 Coke, 123. Coke's Lit. 247, a.) The deeds of all such persons are void; for the terms "*non compos,*" of unsound mind, are legal terms, and import a total deprivation of sense. (2 Mad. 569.) Prior to our revolution, the Court of Chancery in England entertained jurisdiction in such cases only; mere imbecility of mind, not amounting to idiocy or lunacy, not being considered as sufficient to interfere with the liberty of the subject over his person and property. Latterly, a different doctrine has prevailed. The Court of Chancery has entertained jurisdiction in such cases. In the *Matter of Barker,* (2 John. Ch. Rep. 232,) the cases on this subject are reviewed. It was considered as founded in good sense and the necessity of the case, for the protection of a numerous class of persons, whose minds have sunk under the power of disease, or the weight of age, and were liable to become the victims of folly or fraud. This enlarged jurisdiction seems to have sprung up since the time of Lord Hardwicke, and, as Mr. Maddock observes, (2 Mad. Ch. 573,) "was rather arbitrarily introduced, so much so, that it has more than once been hinted that legislative provision on the subject would be proper." Without, however, questioning the propriety of assuming jurisdiction in such cases, it may be observed that the doctrine, if well founded, does not prove that a deed fairly obtained from a person, who might be a fit subject for a commission in the nature of a writ *de lunatico inquirendo,* could be awarded in a Court of law. Indeed, the contrary is strongly implied; for the ground of interference is as Lord Erskine observes, (12 Vesey, 445,) to protect a party in his second state of infancy. By such a proceeding, the right of a party to contract, who is incapable of managing his affairs, by reason of partial derangement of mind, is taken for granted.

The question on the validity of a deed executed prior to a commission of this nature, would not in the least be affected by such commission. It must be shown that the

grantor was *non compos*, within the legal acceptation of the term; that it was not a partial, but an entire loss of the understanding; for the common law seems not to have drawn any discriminating line by which to determine how great must be the imbecility of mind to render a contract void, or how much intellect must remain to uphold it. The difficulty of making such discrimination is apparent. If a man has sufficient capacity to work his farm, or tend his mill skilfully, will the law deny him the right of selling either? I apprehend not. How is a purchaser to protect himself, if the quantum of intellect is the criterion by which to determine whether the contract is valid? He may act with the utmost integrity, and yet be in danger; for although it be established that the party with whom he dealt had understanding, deemed sufficient for the provident management of his affairs, by this rule the contract would be void. But weakness of understanding is not, of itself, any objection in law to the validity of a contract. If a man be legally *compos mentis*, he is the disposer of his own property, and his will stands for a reason for his actions. (*Osmond* v. *Fitzroy*, 3 P. Wms. 129. Pow. on Con. 30. 1 Fonbl. 60.)

According to this doctrine, the plaintiff has failed to invalidate the deed on the ground that Cadwell was *non compos*. The testimony adduced at the trial clearly shows that he is not included in the legal definition of that term. It is abundantly proved, by a number of witnesses, that he was perfectly rational, and possessed his ordinary intelligence at various times, when they saw, conversed and transacted business with him, up to the time of executing the deed; and from their intimate acquaintance, they pronounced him, in their opinion, of sound mind.

It is true, a number of the plaintiff's witnesses consider him of unsound mind, and incapable of managing his concerns; but, on examining this testimony, it will be found that the opinion rests on specific facts, which do not warrant an opinion to that extent. Much seems to have been inferred from the fact, that he did not recollect persons coming to his mill; that he took no part in the settlement of his accounts, although present; that he indulged in idle stories;

at he talked of turning the water back, so as to obtain the benefit of it the second time ; that he was incoherent and unconnected in his statements ; and greatly affected by very trivial circumstances. I admit these are proofs of a weak or impaired understanding ; but they do not satisfactorily prove any thing more. From the same witnesses it may be collected, that in some respects, at least, he was rational. It seems to be conceded that, during all this time, he was a miller, and did the work well ; for there is no complaint. No witness states that he was deficient in conducting this business. This alone proves that he had memory and judgment. The taking of toll correctly, grinding the different kinds of grain, so as to satisfy customers, and bestowing the care necessary to prevent confusion, is of itself satisfactory proof that he had competent understanding in this respect. Besides, he bought, sold and took notes. He, at different times after the deed was given, mentioned his inducement for making the conveyance. The cause for so doing is always stated in the same way. It can not be correctly said that in his situation it was unnatural or absurd. The fact that he had deserted his wife and children twenty years before, shows very clearly that they would not be the objects of his bounty.

On the whole, it appears to me that Cadwell had memory and judgment to a moderate extent ; and was not disabled, by law, from selling his farm and giving the deed. The plaintiffs have failed in showing a general incapacity ; at most, they have shown only a want of understanding on some occasions. There is not sufficient within the rule, to impose on the defendants the necessity of proving that he was sane when he did the act.

The next question is, whether the evidence makes out a case of fraud or imposition. In discussing this point, it is conceded that, although mere weakness of understanding is insufficient, it furnishes strong ground of suspicion, that when persons, in such a state, execute conveyances, they are acted upon by improper influence, and, therefore, wherever fraud can be collected from the circumstances of the transaction, Equity will interpose and relieve against it.

Courts of Law have also a concurrent jurisdiction with Courts of Equity where the fraud can be clearly established ; and will relieve by making void the instrument. (*Bright* v. *Eynon*, 1 Burr. 393, 1 Fonbl. 61.)

But Courts of Law have not, in all cases of fraud, a con current jurisdiction.  Lord Coke, (in 3 Inst. 84,) in speaking of the jurisdiction of Courts of Equity as to frauds, covin and deceit, seems to admit that all frauds are not relievable at law.  The distinction between legal and equitable jurisdiction upon fraud is this : that at law it must be proved, not presumed ; so that equitable jurisdiction may be exercised upon an instrument unduly obtained, when a Court of Law could not enter into the question.  (18 Ves. 483.)  In *Butcher* v. *Butcher*, (1 Ves. & Beames, 98,) Lord Eldon observes, that some Judges have said, that a deed can not be fraudulent, unless it be fraudulent both in law and Equity ; but to that doctrine he could not agree, though a strong inclination had been evident to say, whatever is Equity ought to be law ; an opinion acted upon by Mr. Justice Buller, who had persuaded Lord Mansfield to act upon it, until it was reformed by Lord Kenyon, with the assistance of the same Judge ; yet the clear doctrine of Lord Hardwicke, and all his predecessors was, that there are many instances of fraud that would affect instruments in Equity, of which the law could not take notice.  The broad ground assumed by Lord Mansfield, ( 1 Burr. 396,) is, that Courts of Equity and Courts of Law have a concurrent jurisdiction to suppress and relieve against fraud.  This doctrine has, however, been subsequently qualified, according to the distinction taken by Lord Eldon, and is founded in good sense.  I am not aware of any express adjudication in our Courts.  But in 4 Dessa. Ch. Rep. 684, it is sanctioned.  It was there held, that fraud may be presumed in Equity, but must be proved at law.  In accordance with these principles, a variety of cases have been decided, and relief afforded in Equity, where, from the nature of the transaction and the situation of the parties, fraud and imposition might be presumed.  (3 P. Wms. 129.  Powell on Con. 31)  So, also, in *Chesterfield* v.

*Jansen*, (2 Vesey, 155,) Ld. Hardwicke describes one species of fraud, that may be presumed from the circumstances and condition of the parties contracting. And this, he says, goes further than the rule of law, which is, that fraud must be proved, not presumed. Inadequacy of consideration is also a badge of fraud, or a fact connected with other circumstances from which fraud may be inferred. (1 Bro. Ch. Cas. 1.) So, also, a conveyance, obtained.from persons uninformed of their rights, will be set aside, though no actual fraud be proved. (2 id. 150.) In these and many other cases that might be cited, Equity considers the instruments, as obtained fraudulently from the circumstances and relation of the parties, although no actual fraud is proved. · Yet in none of these cases has it been decided that a Court of Law would declare the instrument void.

If the preceding doctrine be correct, it follows that the facts disclosed in this case are not of a character to entitle a Court of Law to declare the deed void. I have not discovered any evidence of actual fraud by the grantee of Cadwell, or that any deception was practised, or inducements held out to gain the title. If the plaintiffs are entitled to relief, it must be in Equity, on the ground of age, imbecility, the consideration and nature of the contract from which fraud is to be inferred. I apprehend, however, that enough is not shown to set aside the deed in that Court. Cadwell appears to have been the actor and to have understood the transaction. He takes care to provide for himself, his wife, and the woman with whom he had cohabited, and in consequence of age and infirmity, is willing to surrender the property into other hands ; not to a stranger, but one who had married a person reared in his family, and to whom he probably considered himself *in loco parentis*. There is nothing so surprising or unusual in such a course as to excite suspicion ; and as imbecility of mind, singly, is not sufficient, I incline to think that relief would be denied. Be that as it may, a Court of Law is not the proper forum.

On the whole, I am of opinion that the verdict be set aside and a new trial granted.

New trial granted.