THE CHILDREN'S AID SOCIETY OF THE CITY OF NEW YORK, Appellant, *v.* JAMES LOVERIDGE Executor, etc., et al. Respondents.

| 70 | 387 |
| 111 | 245 |

One named as executor in a will is not prohibited from being a witness thereto, and is not rendered incompetent either by the Revised Statutes (2 R. S., 65, § 50), or by the Code (§ 399) as a witness upon probate of the will to prove its execution.

If disqualified by the Revised Statutes, this is so far modified and controlled by the Code (§§ 398 and 399), that he is rendered entirely competent.

Where it appeared that at the time of the execution of a will there were no other near relatives to call or consult; that former beneficiaries, who were not summoned to be present, had excited the prjeudices of the testatrix, who had intended in consequence to exclude them from participation in her estate; and that disinterested persons were sent for as witnesses, but could not be obtained; that the drawing of the will by the executor was, at the express request of the testatrix, who, upon its being suggested, objected to having the attorney who had drawn former wills, called, and particularly requested that it should be kept private; and that the disposition made was in accordance with the intention of the testatrix, as expressed by her to her physician and other disinterested persons; *held*, that the explanation was sufficient to rebut any presumption of fraud or undue influence; that, while the executor should have objected to drawing the will, this act was not such an abuse of confidence, under the circumstances, as to invalidate the will.

A will was executed on Sunday. At the request of the testatrix, it was dated the previous day; *held*, that this was no evidence of fraud.

The fact that an aged person is forgetful and at times labors under slight delusions, does not *per se* establish want of testamentary capacity.

In order to avoid a will, upon the ground of undue influence, it must be shown that the influence exercised amounted to moral coercion, which restrained independent action and destroyed free agency; or that, by importunity, which he was unable to resist, the testator was constrained to do that which was against his free will and desire.

Although by the will of an aged invalid, radical changes are made from previous testamentary disposition, yet when the testimony shows that the act was free, voluntary and intelligent, the will will be sustained.

Where those who surround such a testator and are present at the execution of the will are interested, either in their own behalf or in behalf of friends who are beneficiaries, and no outside or disinterested persons are present to witness or participate; where the will is drawn by one named as executor, and members of whose family are beneficiaries; and where the executors named in the will are the witnesses thereto; while these

.facts may call for and impose upon the proponents of the will the burden of explanation, they are not conclusive of fraud or undue influence, and do not necessarily render the will invalid.

(Argued May 29, 1877; decided September 18, 1877.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department affirming a decree of the surrogate of the county of New York, admitting to probate the last will and testament of Eliza Hearsey, otherwise known as Eliza Hall, deceased. The will was dated July 11th, 1874.

The facts appear sufficiently in the opinion.

*Henry L. Clinton, David R. Jaques* and *Samuel Hand*, for the appellant. The fact that the witnesses to the will were named therein as executors rendered them incompetent. (2 R. S., 65, § 50; *Robertson* v. *Cain*, 5 N. Y., 125; *Converse* v. *Wooley*, I Abb. Ct. of App. Dec., 441; *Burritt* v *Silliman*, 13 N. Y., 93; 16 Barb., 198; *McDonough* v. *Loughlin*, 20 id., 238.) The proof offered by the appellant to establish the will of February 8, 1872, was improperly excluded. (3 R. S. [6th ed.], 67, § 62; *Van Wiel* v. *Benedict*, 1 Bradf., 115; *Carle* v. *Underhill*, 3 id., 101; *Terhune* v. *Brooksfield*, 1 Redf., 226; *Mason* v. *Mason*, 11 Abb. Pr. [N. S.], 97; *Kepping* v. *Carlo*, 1 Robt. Ecc. R., 270; *Urquhart* v. *Fouker*, 3 Adams, 56.) The appellant had a right as legatee under the former will to contest the later. (2 R. S., 126, §§ 41, 47; id., 130, § 170; *Wald* v. *Ryan*, 1 Brady, 433; *Foster* v. *Foster*, 7 Paige, 48; *Marvin* v. *Marvin*, 11 Abb. Pr. [N. S.], 99.) There was sufficient to show that the testatrix was subjected to undue influence. (*Lynch* v. *Clements*, 24 N. J. Eq., 431; *Turner* v. *Cheesman*, 2 McC., 265; Redf. on Wills, 529; *Darley* v. *Darley*, 3 Bradf., 481, 507, 508; *Tyler* v. *Gardner*, 35 N. Y., 596; 31 Barb,, 25; *Marvin* v. *Marvin*, 5 T. & C., 431; 3 Hun, 139; *Gardner* v. *Gardner*, 34 N. Y., 155; *Séguin* v. *Séguin*, 3 Keyes, 663, 669; 3 Keyes, 669; 41 Penn. St., 312.)

Fraud and undue influence may be proved by circumstances. (*Marvin* v. *Marvin*, 3 Abb. Ct. App. Dec., ; *Reynolds* v. *Root*, 62 Barb., 253, 254; *Forman* v. *Smith*, 7 Lans, 443; *Sears* v. *Shafer*, 2 Seld., 272; *Delafield* v. *Parish*, 25 N. Y., 95; *Lee* v. *Dill*, 11 Abb., 214, 249; *Davies* v. *Culvert*, 5 G. & J., 269; Wills on Cir. Ev., 73, 76, 89; Redf. on Wills, 472, note 519, 522, 523, 524; *Lewis* v. *Mason*, 109 Mass., 169; *Muntain* v. *Bennett*, 1 Cox, 355; *Jackson* v. *Jackson*, 32 Ga., 325; *Taylor* v. *Willburn*, 20 Mo., 306; *Hall* v. *Hall*, 1 E. L. R. [P. & D.], 482; *Lynch* v. *Clements*, 24 N. J. Eq., 431; 1 Jarman on Wills, 37; *Waterman* v. *Whitney*, 1 Kern., 164; *Rollwagen* v. *Rollwagen*, 63 N. Y., 504, 519.) Secrecy in regard to the making of a will and in regard to its contents is a circumstance to be considered with reference to undue influence. (*Mowry* v. *Silber*, 2 Bradf., 133, 152; *Tyler* v. *Gardner*, 35 N. Y., 93; *Blewitt* v. *Blewitt*, 4 Hagg, 463.) This appeal being in the nature of a rehearing in equity, the whole case will be considered in this court. (*Schenck* v. *Dart*, 22 N. Y., 420; *Howland* v. *Taylor*, 53 id., 627.) The will having been drawn and its execution superintended by an interested party and the legal presumption of fraud or undue influence not having been overthrown by affirmative evidence, probate should have been refused. (*Rollwagen* v. *Rollwagen*, 63 N. Y., 504; *Tyler* v. *Gardner*, 25 id., 581; Jarman on Wills, 38; *Mowry* v. *Silber*, 2 Bradf. 133; *Foreman* v. *Smith* 7 Lans, 443.)

*H. G. & R. W. DeForest*, for the respondents. There was no evidence to sustain the allegation of undue influence. (*Gardiner* v. *Gardiner*, 34 N. Y., 161.) The witnesses to the will were competent. (1 R. L., 364; *Jackson* v. *Christman*, 4 Wend., 277; *Peebles* v. *Case*, 2 Bradf., 226; *Lawrence* v. *Norton*, 45 Barb., 450.) They were not disqualified from testifying by reason of their nomination as executors. (*Sears* v. *Dillingham*, 12 Mass., 357; *Richardson* v. *Richardson*, 35 Vt., 238; *Comstock* v. *Hadlyne*, 8 Conn., 263; *Brown* v.

*Wood*, 17 Mass., 68; *Snyder* v. *Bull*, 17 Penn., 59; 12 S.
& M. [Miss.], 250; *Burritt* v. *Silliman*, 16 Barb., 201; 13
N. Y., 93; *McDonough* v. *Laughlin*, 20 Barb., 645.)   Under
the Code the executors were competent witnesses, although
interested in the result.   (*Will of Levy*, 1 Tuck., 87; *Pruyn*
v. *Brinkerhoff*, 7 Abb. [N. S.], 400; *Will of Dennis*, Daily
Register, May 2, 1876.)

MILLER, J.   The evidence upon the hearing of this case
covers an extended field of inquiry.   The testatrix during
her life made five different wills, the first one in 1857, and
the last, which is the subject of this controversy, on the
twelfth, but bearing date the eleventh day of July, 1874.
She died on the 5th day of February, 1875, being at the
time seventy-eight years of age, and possessed of an estate
valued at about one hundred thousand dollars.   She was a
widow lady without any children, and with no very near
relatives, in whom she took any particular interest.

The will in controversy bequeaths to Mary Elizabeth
Noyes, of Boston, a daughter of a favorite cousin, Mrs. Sarah
E. Noyes, all her stocks, bonds and securities, which consti-
tuted the bulk of her estate.   And the remainder, consisting
of her house and lot in the city of New York, in which she
had resided for many years, and the furniture therein is
devised and bequeathed to Elizabeth and Harriet Loveridge,
daughters of James and Elizabeth Loveridge, who resided
with the testatrix at the time of, and some time prior to her
decease.   She also appointed Mr. James Loveridge and one
Coolidge Barnard, of Boston, her executors.

By her will executed in 1872, immediately prior to the
will of 1874, the testatrix bequeathed to Miss Noyes, the
principal legatee in the will of 1874, an annuity for life
of one thousand dollars; a legacy of five thousand dollars
to her cousin Sarah E. Hearsey, and of the same amount to
Mr. Van Riper and his grand-daughter, and to Mrs. Holmes,
her house-keeper at that time.   She also bequeathed to Mrs.
Blauvelt, a daughter of Mr. Van Riper, the house and lot

where she lived and her household furniture; and she gave the residue of her property in equal shares, to the benevolent societies hereafter referred to. She named Mr. Van Riper and the husband of Mrs. Blauvelt as her executors. Miss Noyes, the principal legatee under the last will, is therefore interested to a considerable extent in the will of 1872, and the principal contention lies between the other parties referred to. Upon the hearing, the contestants of the will of 1874 were the Children's Aid Society and the St. Luke's Home, the residuary legatees under the will executed in 1872; and the contest is substantially narrowed down between the two wills.

The questions which were controverted relate mainly to the testamentary capacity of the testatrix, and the exercise of undue influence over the testatrix in procuring the execution of the will of 1874, by those who were beneficiaries, and who were present and took part at the time in the execution of the same.

An objection is urged as to the competency of the attesting witnesses to the will of 1874, Loveridge and Barnard, upon the ground that they were the executors nominated by the will. The objection to the testimony of Loveridge was somewhat general, being to any matter connected with the execution of the will, and is not made more specific by the motion to strike out all the testimony of conversations, or any interviews between the decedent and the witness. Some of these conversations appear to have been called out by the contestants, and hence the motion referred to could not properly have been granted. As to Coolidge Barnard, the other executor the objection was to calling for any communication between the witness and the decedent, because the witness was a subscribing witness to the will, and was interposed after proof had been given of the formal execution of the same without any objection, and no motion being made to strike out his testimony. It may perhaps be questionable whether the objection was presented in due season and as to this witness, as he was a non-resident of the State, it was not

necessary to call him, and proof of his handwriting would have been sufficient. Conceding, however, that the question is now before us, we are of the opinion that no valid objection existed to the testimony of these witnesses. The statute (2 R. S., p 65, § 50), which is relied upon, does not expressly prohibit a devisee, legatee, or party in interest, from being a witness, and merely affects the right of such person to the benefit of the provision made. It is not manifest that the statute disqualifies entirely an executor from being witness to a will; and, as an original question, I should be inclined to hold that it was not intended to cover any such case. (See *McDonough* v. *Laughlin*, 20 Barb., 245.) Be that as it may, however, we think the provisions of the Code (§ 398 and § 399) so far modify and control the statute as to render an executor entirely competent. Such appears to be the rule adopted in the Surrogates' Courts, and is no doubt the correct one. (1 Tucker, 87.) Independent, however, of the considerations last suggested, we are inclined to think that the execution of the will was duly proved by the other witnesses who were present at its execution, and who were sworn upon the hearing. The point, therefore, is not well taken.

Nor is there any valid ground for holding that Loveridge as a party to the proceeding was incompetent under § 399 of the Code, to prove the execution as a transaction between himself and the decedent, or that this provision covers any such case.

The evidence produced upon the hearing before the surrogate failed to establish satisfactorily a want of testamentary capacity in the testatrix at the time when the instrument, now the subject of adjudication, was executed. There was proof to establish that during the summer of 1874, subsequent to the execution of the will, the deceased on two or three occasions labored under the delusion that she was still living at her former residence in King street. At other times she was flighty at night, while ill; and, upon one occasion, in the night time, she used irrational language, saying that a conspiracy was going on ; she imagined that she heard

voices, and said, as one witness testifies, many things which were not remembered. The delusion as to her residence is sought and claimed to be accounted for, in part, by proof that she had drank ale, which was discontinued, and after this no further symptoms of this character appeared. But, even if no particular explanation is given of the delusion referred to, it does not make very strongly to sustain a want of testamentary capacity. As to the other delusion, she stated the next morning that she had dreamed there were robbers in the house, and was evidently frightened, and it appears that she had also drank ale the night previous. It is by no means remarkable that she should have been, at times, thus disturbed in her slumbers, and her flightiness may have been no more than a dream, which is common to persons of all ages and conditions, even when not laboring under bodily disease. There is proof, also, that she forgot that an intimate friend, Mrs. Ginochio, was dead, and supposed she was still living in the neighborhood, when she had died several months previously. The old and infirm are necessarily the subjects of a loss of memory, and it is not very unusual that a single fact should have passed temporarily from the recollection of the testatrix.

The facts referred to are entirely insufficient to establish mental unsoundness; and, even if they have any bearing in that respect, are fully answered by the surrounding circumstances as well as the positive testimony produced by the proponents. The testatrix was a woman advanced in age ; had been in ill-health for twenty-five years ; afflicted with chronic maladies, which, as Dr. Wilkes, her physician of long-standing, testifies, did not affect her mind. This witness also states that she was a woman of strong mind, very intelligent, and without the slightest particle of any weakening of the mind, or insanity, and that about the time of the execution of the will her intelligence was perfect, and this condition of her mind and her intelligence continued to within forty-eight hours of her death; that her memory was excellent; he never saw her, at any time, when he did not

consider her entirely capable of making her will, and never doubted her competency. No witness is called who contradicts this evidence, or expresses a different opinion. The sanity of the testatrix is abundantly established, and I do not understand that a distinct allegation is made to the contrary. The argument is, however, that even if she possessed testamentary capacity, her habits, during the latter part of her life, evince that her mind was in such a state of decay as to render her an easy-victim of undue influence. The personal habits of the testatrix are referred to; but, even conceding that the incidents and circumstances relied upon are fully authenticated by the proof, they are too trivial and unimportant to overcome the strong and unanswerable evidence which establishes the soundness of the testatrix's mind.

The position of the contestants is that the execution of the will was procured by the exercise of undue influence on the part of those who were the beneficiaries, and who, at the very time of the making of the same, were possessed of her confidence and surrounded her. In order to avoid a will, upon any such ground, it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent, resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear. (1 Jarman on Wills, 36, 37; *Gardiner* v. *Gardiner*, 34 N. Y., 155, 162; *Seguin* v. *Seguin*, 3 Keyes, 663; *Brick* v. *Brick*, 66 N. Y., 144.)

Gratitude, love, esteem or friendship which induces another to make testamentary dispositions of property can-

not ordinarily be considered as arising from undue influence, and all these motives are allowed to have full scope, without in any way affecting the validity of the act. So, also, lawful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the disposition of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation.

There is no direct proof of importunity or effort on the part of the legatees to induce the testatrix to make the will in question. In fact, it is rarely the case that positive evidence can be furnished that undue influence has been exercised over the mind of a testator in the execution of a will. The circumstances attending the transaction may, however, be of such a character as to lead irresistibly to the conclusion that undue influence has been at work in the execution, and that the will controverted is not the free and untrammeled act of the decedent. The execution of the will in question, as the evidence stands, appears to have been the result of the wishes and desires of the testatrix, and a spontaneous and accurate expression of her real intentions. She had made four other wills previously, at different times, each of which varied in accordance with her then existing wishes, and it is but just to say that each of them exhibit the fact that she was subject to freaks and fancies not always consistent and uniform.

She had been an invalid for many years, afflicted with a *chronic* difficulty of long standing, and, like most persons in that unfortunate condition, it may be assumed that her affections and dislikes were the subject of change and not at all times constant. She was almost alone in the world, with no very near relative to whom she could turn for succor and support, and who, from close family ties, would feel a very strong interest in her behalf, or had especial claims upon her bounty. From the loneliness of her situation in life she had been accustomed and necessitated to look out for herself and

to provide for her own comfort and happiness. Without children, the adopted daughter to whom she was strongly attached, and for whom, in her first and second wills, she had made ample provision, had died, and the infant child she had left behind, who also had been afterwards one of her legatees, soon followed the mother. With her only sister the testatrix had an unfortunate quarrel of long standing, which, in the indulgence of her feelings, excluded her from any participation in her estate. She therefore naturally looked to her cousin, Sarah E. Noyes, one of her associates in early life, and her daughter Mary E., as the nearest relatives who had strong claims for consideration in the disposition of her property. And these she remembered in each of her wills to a greater or less extent. She thus evinced a settled and consistent purpose not to overlook their claims upon her as the nearest of her kindred, which was reiterated in all of her different wills to the very last. Besides the strong claims of blood and consanguinity, which no doubt operated in respect to these persons, she had proposed, in 1870, that Mrs. Noyes and her daughter should come and live with her, and in consideration of her daughter giving up her position as a school teacher, for which she received a salary of $1,000 annually, she proposed as an object to make a new will in favor of the mother and daughter, and to give them not less than $50,000. They came in September, 1870, and in November following she made a will, by which she made them her residuary legatees after some inconsiderable legacies.

They remained until September, 1871, and then returned home. The alleged cause of the separation was that their presence was no longer needed, as the testatrix had invited another person to become an inmate of her house, and that Mrs. Noyes preferred to return to her former home. It is quite probable, however, that neither party found the arrangement entirely agreeable, although it was terminated amicably and by mutual consent. The friendly relations between her and the Noyes family were still kept up, and there was no absolute estrangement or open difference between them, as

with an honest sense of justice she continued to remit the amount of Miss Noyes' salary, and the correspondence between Mrs. Hall and Mrs. and Miss Noyes are full of the warmest expressions of affection and regard. It appears, however, that after their departure in February, she made another will in which she gave only an annual income of $1,000 a year, the amount of Miss Noyes' salary, which she had lost by the change, during her life, and $5,000 to Miss Noyes' mother, and made two charitable institutions her residuary legatees. She also, in this will, gave to Mrs. Blauvelt her house and lot, and left a legacy of $5,000 each to Mr. Van Riper and his grand-daughter.

While she did not forget Mrs. Noyes or her daughter, she turned to strangers to whom, it appears, she was under obligations, or with whom she had intimate personal relations, to bestow her benefactions upon them more largely. Absence or some other cause, it is not necessary to determine what, had operated on the mind of a chronic invalid full of whims and caprices, and induced her to consider her relatives less entitled to consideration. I think it is apparent that two leading purposes were always uppermost in her mind. First. The claims of her relatives, Mrs. Noyes and daughter, more or less, according to the then existing circumstances. And secondly, the claims of those who, although strangers in blood, had in her hours of loneliness sorrow and distress, ministered immediately to her comfort and happiness by attentions and acts of kindness which tended much to alleviate her sufferings, and relieve the tediousness of her long-continued and painful illness and close confinement.

The benevolent institutions mentioned in some of her wills do not seem to have engrossed her attention or sympathies very greatly; and although at times remembered, upon being reminded of them, it does not appear that they were a controling and absorbing object of her thoughts.

Considering the feelings of affection which the testatrix had manifested for Mrs. Noyes and her daughter for many years, and the provisions she had repeatedly made for them

in all her wills, it is by no means strange or remarkable that as her life was fast ebbing away and drawing to a close, she should feel bound by the strongest sense of inclination, as well as of affection and duty, to make an ample and generous provision for their support, comfort, and happiness. And as the case stands, it cannot be said that such a provision alone on its face shows undue influence or force, or a coercion improperly exercised. So far as Miss Noyes is concerned, there is no evidence to warrant the conclusion that she in any way knowingly was a party to any improper means which produced the bequests made in her favor in the last will, although the friendly feeling of the testatrix was more manifest than in the will of 1872; it was not as much as in the prior will of 1870, and it was no more than under the circumstances might have been the reasonable wishes of the testatrix in the free exercise of her honest judgment, and of her discretion, The bequest, on its face, is not large or extraordinary, and is not stamped ineffaceably with the impress of undue influence, fraud or coercion. To whom else would the attention of an old infirm person be directed in the last extremities of her fleeting existence, when the world was fast fading from her view, than to her relative with whom her early life had been passed, or her relative's daughter, towards each of whom she had always manifested and with whom she had continuously preserved the most affectionate and intimate relations. They had ministered to her whims and caprices, made sacrifices for her comfort, and above all, were allied to her as near kindred.

It was but the expression of the natural feelings of the testatrix, who had never forgotten these objects of her bounty. So far, then, as the facts indicate, it is not a legitimate inference that Miss Noyes employed undue influence to induce the bequest made in her behalf, and did her acts stand alone, no further question would remain to be considered in reference to this branch of the case. If she did it not in her own behalf, it cannot be claimed that she exercised undue influence over the testatrix for the benefit of the

Loveridge family, who were substantially put as beneficiaries in the place of Mrs. Blauvelt and Mr. Van Riper.  The most I think which can be urged is that, although, as far as Miss Noyes was concerned, the bequest was just and right, and in accordance with the real intention of the testatrix, that her acts and conduct contributed to induce the testatrix to make provision for the Misses Loveridge, and hence may be regarded as connected with the alleged conspiracy unduly to influence her in changing her former will.  In this point of view, it becomes important to consider whether the change was made for good and sufficient reasons, and is satisfactorily accounted for, or was the result of fraud or coercion.

A legacy was devised to Mr. Van Riper in the will of 1870, which was increased in the will of 1872, and in the latter a devise made to Mrs. Blauvelt of the real estate, and she also bequeathed to her the furniture, as well as other personal property.  In the spring of 1873, Mrs. Blauvelt was urged to take charge of the house of the testatrix, which she reluctantly consented to do, it having been stated to her that it was her duty, as she was provided for in the testatrix's will.  She had been a friend of the adopted daughter of the testatrix, was on intimate terms with the family of the testatrix, and was under obligations to her father, Mr. Van Riper, for services he had rendered in the management of her property.  Without recapitulating the circumstances which attended her taking a position so delicate and trying, which are fully considered in the elaborate opinion of the surrogate, it is sufficient to say that her health and strength were inadequate for the difficult task she had undertaken, and she was unable to meet the demands and expectations of one who, from sickness, infirmity and age, exacted sacrifices far beyond what she was capable of enduring or willing to submit to; and, as might have been expected, it was beyond her power to satisfy the whims and wishes of the testatrix, and she was glad to leave the house and relinquish her charge.  This was not done without mutual estrange-

ment and considerable bad feeling on both sides, and without commenting upon the facts connected with this disruption of their amicable relations, and the reasons given for the same, it cannot be denied that Mrs. Blauvelt had lost favor, and most probably without any omission, neglect of duty or fault on her part. It is evident that she no longer held a prominent place in the affections of Mrs. Hall, and as the testimony showed, was regarded with unfriendly feelings and dislike by the testatrix. Borne down with suffering and the weight of a painful disease, it is by no means remarkable that in her diseased condition she should have magnified Mrs. Blauvelt's faults, if any there were, mistaken her character, misconstrued her kind acts and motives, and regarded her in a different light from what she had previously done. This is but the common history of the confirmed, aged invalid, who sometimes distorts the best intended acts and turns with hopeful confidence to some new object for relief.

But this does not show absolutely such a want of capacity as renders the testamentary act invalid, or such weakness and imbecility as of itself raises a presumption that any subsequent testamentary act is the result of undue influence.

The next phase in the case was the substitution of the Loveridge family, consisting of Mr. Loveridge, wife and two daughters, in the place of Mrs. Blauvelt, in the house, and very soon afterwards in the affectionate regards of the testatrix. They were acquaintances of some years, and she had been intimate with the family for a long time, they had been kind to her adopted daughter in her last illness, and it is not manifest that they made any apparent effort to supplant Mrs. Blauvelt in the affections of the testatrix.

In 1873, Mrs. Hall proposed to Mrs. Blauvelt to take the house, and she suggested, in reply, that there were other families better situated, and mentioned the Loveridge family, because they had always been intimate with her. Both of the daughters were teachers and musicians, and Mrs. Hall is represented to have been infatuated with music, and had given the younger daughter her first lessons. Mrs. Hall

was also a person of literary culture, fond of reading and reciting, familiar with the poets ; could repeat almost all of Byron and Shakespeare, and conversed very intelligently. The family all made themselves agreeable, useful, and necessary for her enjoyment.   Each of them studiously consulted her wishes, yielded to her requirements, and were diligent, faithful, and devoted in their efforts to amuse the testatrix, assuage her sufferings, and promote her comforts.   The assimilation of tastes with the young ladies of the family, who were cheerful as well as intelligent, naturally aided in the promotion of harmony and good feeling, and they moved on together quietly, with no discord or differences to mar or disturb their pleasant relations.   Dr. Wilkes testifies that she spoke of them in the highest terms of affection, and seemed perfectly happy in their society.   She writes to Miss Noyes, announcing that the Loveridges were there in the place of Mrs. Blauvelt, and that the girls were the life of the house. Soon after she again wrote that they were the very ones to make one feel happy, and that was the way she felt now.

They evidently were congenial society for the testatrix, and she was thus led to regard them with great favor.   It is evident that she became warmly attached to all the members of the family.   That she entertained for them the most favorable consideration in the disposition of her estate, was entirely consistent with the history of her previous action in this respect.   Besides the kindred to whom we have referred, she next, as her former wills clearly evince, regarded such friends as immediately surrounded her.   It would not have been in accord with her former history to have overlooked these immediate associates and attendants upon her wants and contributors to her happiness.   With this state of feeling on her part, the time arrived when she had reason to suppose, as I think may be assumed, that her end was approaching, and then it was, if the testimony on that subject is not to be entirely discredited, that she caused a dispatch to be sent to Miss Noyes to come to her sick-bed.   She arrived as desired, and what then transpired in the execution of the will in

question, is the real point upon which it must be determined whether it was the result of a conspiracy, fraud, or undue influence.   A radical change was made in the disposition of her estate; at least so far as relates to those who were not connected by any ties of blood, and who were strangers and without any especial claims to consideration.   So far as the provision for Miss Noyes is concerned, it is, as we have seen, not more than was reasonable to expect, considering the circumstances existing ; but as to the other persons named, they occupy a far different position.

The rule is well understood that when a change is made in the will of a sick person, which is apparently contrary to a previous fixed and determined purpose, it is the duty of courts to scrutinize closely, with a view of ascertaining whether the act was free, voluntary, and intelligent.   (*McLaughlin* v. *McDevitt*, 63 N, Y., 213.)

The testimony shows that after the arrival of Miss Noyes and Mr. Barnard, her friend and companion, and a general conversation on Sunday between the testatrix and most of those in the house, and after all but Miss Noyes and one of the Misses Loveridge, had retired from the room, the testatrix announced her purpose to make a new will, and a will was accordingly drawn and executed.   The circumstances under which this was done are fully considered in the opinion of the Probate Judge already referred to, and it is unnecessary to re-examine them at length.   We shall, therefore, be content to refer to such prominent features of the transaction as are considered liable to objection and affect the question presented, as to fraud and undue influence.   Some of these, we think, were of such a character as calls for explanation ; and it may well be said that the burden of proof devolved upon the proponents to rebut the presumption of fraud or undue influence.   Those who surrounded the testatrix, and were present at the execution, were mainly interested in their own behalf, or in regard to friends who were the recipients of bequests or devises.   No outside or disinterested party was at hand to witness or participate in

the act.   It appears, however, that there were no other near
relatives to call or consult, and hence, in this respect, the case
differs from one where a large family are interested, and in
opposition to the testator's previous declared intentions, a
will is executed in favor of one of its members who lived
with the decedent, exercised a controlling influence over her
or him, and privately or secretly procures the execution of
a will in his or her own behalf, without consultation with
any one, or knowledge of any other persons who were enti-
tled to equal consideration.   (*Forman* v. *Smith*, 7 Lans.,
443; *Reynolds* v. *Root*, 62 Barb., 250; *Lee* v. *Dill*, 15 Abb.,
214;   *Tyler* v. *Gardner*, 35 N. Y., 580; *Marvin* v. *Marvin*,
3 Abb. Ct. of App. Dec., 192.)   Nor is it just ground for com-
plaint that the parties who had aroused the prejudices of
the testatrix, and who, as the testimony shows, she intended
to exclude from any participation in her estate, were not
required to be present.   It would certainly have been more
in accordance with a proper course of proceeding if the tes-
tatrix's lawyer, or some other competent person, had been
called upon to prepare the will.   Upon its being suggested
by Miss Loveridge that McAdam, who had drawn her three
former wills, should be sent for, she objected, saying that
there was no need of it; that Mr. Loveridge could do it as
well as anybody.   It is also proved that her particular
request was that it should be kept private, and therefore she
did not want McAdam to draw it.   If she had thus decided,
it would have been difficult to change the purpose of one
who was peculiarly remarkable for decision, steadfastness,
and pertinacity in carrying out her purpose.   Mr. Loveridge
himself should have objected, and in not doing so he cer-
tainly at least failed to appreciate the delicacy of the position
in which he was placed, as well as to form a proper estimate
of the responsible character of the task he had undertaken.
It is not uncommon, however, for those unfamiliar with
legal procedure to attempt to perform such an important
service, and it often happens as professional experience, and
the decisions of the courts evince, that disputes and litigation

are the result of such labors, and quite frequently the purpose intended by a decedent entirely frustrated.    There is, also, some ground for supposing that the testatrix regarded McAdam as Mr. Van Riper's counsel, even if that fact is not made distinctly to appear.    While the law regards with disfavor and suspicion the conduct of a party who occupies confidential relations to another, and takes advantage of his position to obtain an unjust will in his favor, or in behalf of his kindred, and thus employs his influence to control free action and judgment in the disposition of an estate, the legal presumption which arises from such an act may be rebutted by testimony and circumstances showing that what was done was in entire conformity to the express desire and intention of the decedent.    And, in considering such an act, it must not be overlooked that in this case no near relatives, who have been injured or excluded from their natural rights, make any complaint, but the parties to be affected are mostly strangers, who have only been selected by reason of friendly offices, or under a sense of obligation for kindnesses extended, or are institutions of charity and benevolence which appeal to the liberality and generosity of the human heart.    In view of the circumstances and the evidence presented, I am not prepared to hold that the act of Loveridge was such an abuse of confidence reposed in him as to authorize the conclusion that the will was invalid, for that reason.    I am the less inclined to such a result because the will was in accordance with the intention of the testatrix as expressed by her to her physician and other persons who had no part in its execution, and who were entirely disinterested, to say nothing of the positive testimony of the other parties who were present at the time.

The fact that the witnesses to the will were the executors named therein, who took part and were present at its execution, is a circumstance also to be considered.    It may well be asked why were not other persons, who had no selfish interests to subserve or personal objects to accomplish, invited

to be witnesses ?  The proof shows that other witnesses
were sent for, with Mrs. Hall's assent; that Miss Harriet
Loveridge went to Dr. Wilkes' house for him, and to Mr.
Miller's, each of whom were proposed as witnesses, and that
both of them were out of town.   There is some discrepancy
in the testimony as to whether Miss Loveridge returned
before the will was executed, but this is not very material,
as it is shown that it was attested, at the suggestion of the
testatrix, by the two executors, Mr. Barnard and Mr. Love-
ridge.   It is urged that the sending for witnesses was not
sincere, or they would have waited until Miss Loveridge
returned, and it was purposely executed before her return.
The evidence will scarcely warrant such a conclusion, and
the haste in the execution may very properly be attributed,
at least in part, to the fact that Mr. Barnard intended to
leave for Boston on the same afternoon, and the desire of the
testatrix to make a new will   She had expressed the opinion
that it was not necessary, as there were enough in the house,
and she appeared to be quite willing to have the will exe-
cuted without the presence, as witnesses, of those who were
named.   There is also evidence that, after the two persons
first suggested as witnesses could not be found, Mr. Allison,
a lawyer, was also sent for, and he also was not to be found.
In view of the evidence, there is no foundation for the theory
that there was a combination to prevent witnesses outside of
those who were present from attesting the will.   It was cer-
tainly very informal, loose, and unskillful to allow executors
to become attesting witnesses; but it is neither shown satis-
factorily, nor do the circumstances warrant the inference,
that the business was done in this irregular and hasty man-
ner for the purpose of improperly obtaining the execution
of the instrument.

That the testatrix intended to exclude Mrs. Blauvelt from
any participation in her estate is also indicated by her declar-
ations to different persons to that effect.   Dr. Wilkes testifies
that she complained excessively of a want of attention, a
refusal to supply her with meals when she was sick, and of

what she considered and denominated a want of kindness and ingratitude of the Blauvelts, to whom she had made presents, when she asked for a slight favor, which was refused. She also spoke in the most violent prejudice and dislike, and in the most vehement manner in regard to them. Mrs. Strahman says that she said at one time the Blauvelt family should never have any of her property, and that the Loveridges should have the house and Miss Noyes the rest, and she afterwards told her that she had given the house to the Loveridges. She also complained to Mrs. Bryan and Mary Eccles of Mrs. Blauvelt's treatment of her. Notwithstanding the criticism by the learned counsel of the appellants upon the testimony of the last-named witnesses, in reference to the subject referred to, it is not to be disguised that Mrs. Hall was thoroughly dissatisfied with the course of Mrs. Blauvelt, and that she spoke of her last will as a relief to her mind.

We have carefully considered the circumstances under which Miss Noyes was sent for, and we are unable to discover, from the testimony, that it was done under any false pretense as to the testatrix's illness, or in pursuance of any conspiracy to carry out the alleged purpose of fraudulently and improperly procuring her to execute a will in behalf of those who were provided for. There is no reasonable ground for contending that Miss Noyes was engaged in a plot with Mr. Loveridge to unduly influence the testatrix in making the will. In fact, as we have seen, Miss Noyes and her mother had been especially considered by the testatrix in most of her wills, and it would have been extraordinary, considering her relations to those intimate associates and relatives, if not unnatural, had she done otherwise than she did in making ample provision for their support. There is not anything in the conduct, history, or actions of Miss Noyes, that indicate that she would have become a party to any such scheme as is claimed to have existed and been carried into effect.

Nor have we discovered any valid ground for the position

that the testimony of Miss Noyes on the hearing is so far varied that a court would be authorized to discredit the version which she has given of what transpired at the time of the execution of the will. The most intelligent witnesses may temporarily err as to a particular fact, and afterwards discover and correct the mistake. But such an error does not absolutely and necessarily convey an imputation affecting their credit or veracity, or sanction a disregard of their testimony.

The evidence clearly establishes that the testatrix was in full possession of her faculties; that the will was her free and voluntary act; that she was not in a condition to be a victim of the conspiracy alleged, and any such inference is unwarranted and without evidence to sustain it.

The evidence of Dr. Wilkes to the effect that the testatrix, down to the time of her death, spoke of having made gifts of charities by her will, shows that her memory was not as good as it might have been, and that she had become forgetful. With her increased infirmities and advanced age, and considering that she made several prior wills, in some of which charitable institutions had been remembered, it is not very surprising if she had labored under the erroneous impression that the last will contained similar provisions.

The circumstance is to be considered, however, in connection with other evidence, showing a want of memory, which is relied upon, but it is not conclusive against the validity of the will. The same remarks are applicable to the declarations alleged to have been made to Mrs. Webb, in reference to Mary Eccles, to the effect that she meant to leave her sufficient for her support, and that she had taken care of her.

In reference to this subject, it should be noticed that the testimony of Miss Eccles, as well as some other witnesses, shows that she understood, and it was stated in her presence, that Mrs. Hall had not made any provision for her in her will, but only left it for the ladies who were named therein to see that she should be cared for, and that they promised to fulfill her wishes in this respect. And it also appears that Mrs. Hall understood that such was the case.

The will was executed on Sunday, and antedated the previous day. One of the witnesses, Mr. Barnard, testifies that, upon his informing the testatrix that the date was not there, she requested that they be sure and not put the date on Sunday. Mr. Loveridge says that Mr. Barnard suggested whether it was proper to date it on the day before it was executed, and she answered it was no matter, and made no difference. This discrepancy is of no significance, and cannot be considered as an indication of a scheme on the part of those who were present to impose upon the testatrix.

Nor do we think that there was any preconcerted plan that the servant girl of Mrs. Hall should be absent on that particular occasion.

The omission to make provision for taking charge of her burial-ground at Woodlawn, as had been done in prior wills, is also claimed to be a strong circumstance to show that she did not comprehend the nature of the will which was executed. It does not appear that either of the previous wills was at hand at the time, and as the testatrix seemed exceedingly anxious that the will should be then made, while Mr. Barnard was there, it is not unlikely that this provision which, as the burial-place belonged to Mrs. Hall, was merely the indulgence of extraordinary care, was not considered. That it was thus overlooked, may also be attributed to the fact that the will was drawn by an inexperienced person who was not a professional draftsman, and hence there was a want of particularity, and that attention to details which would otherwise most probably have been given to the subject.

There is no ground for claiming that the will in question was not signed by the testatrix, and that her name affixed to the same was a forgery. The evidence is too strong to warrant any such inference, and the allegation has no testimony to support it.

Unless we disregard the testimony given before the surrogate as not entitled to belief, and hold that the witnesses who were present at the time of the execution of the will have sworn falsely, we cannot resist the conclusion that the circum-

stances attending the testamental act and surrounding the testatrix, which indicated that undue or improper influence may have been employed, are fully and satisfactorily explained and the presumption against the validity of the will, arising from such circumstances, is entirely rebutted.

An attentive perusal of the voluminous evidence, consisting of over 1,000 pages, and a careful consideration of the facts and arguments presented which bear upon the subject, lead to the conclusion that the allegation that undue influence, force, or restraint was exerted over the mind of the deceased, or fraud practiced by those who surrounded her, rests on no solid foundation.

The will appears to have been the offspring of her own deliberate judgment, after undergoing many changes as years advanced and the circumstances of her life varied, and as her feelings were influenced by acts of kindness of those with whom she came in contact. She was susceptible to influences, and appreciated keenly any manifestation of interest in her behalf, and quickly resented any supposed injury. She was perhaps capricious, whimsical, and full of prejudices, but these do not indicate incapacity or necessarily establish that undue influence may have been exercised.

We have discussed such prominent features connected with the controversy as we regard as material, and do not deem it necessary to examine at length some other suggestions which have been urged upon our attention and most carefully considered.

While the courts should see that the testamentary act is freely exercised by the aged, weak, and infirm, without restraint, force or fraud, so as to promote their own comfort and enjoyment, and should guard and protect them with the greatest care and circumspection from imposition and improper influence, they should hesitate to find that undue influence has been practiced when the will is fair and reasonable, according to the common instincts of mankind, and such as might, with propriety and justice, be made by a decedent. Looking at the case in this aspect, and regarding the testimony, as we

are bound to do, precisely the same as if the questions of fact were now for the first time originally presented, we are unable to arrive at a different conclusion than that adopted by the surrogate and General Term, and are of the opinion that each of these decisions was right, and the judgment affirming the decree admitting the will to probate, must be affirmed, without costs to either party.

All concur, except Rapallo, J., absent.

Judgment affirmed.