NEW YORK COUNTY.—HON. D. G. ROLLINS, SURROGATE.—
April, 1882.

## BRISTED v. WEEKS.

*In the matter of the probate of the will of* JOHN J. A.
BRISTED, *deceased.*

Evidence of an hereditary tendency to insanity, in a testator, does not establish that insanity manifested was probably congenital, or that it declared itself at any particular stage of his career.

The opinion of a distinguished alienist, upon the probable mental condition of a patient, years before the latter had come under his observation, though entitled to respect, should be carefully scrutinized before acceptance, in a case where it is contingent upon the correctness of hypotheses not established by the evidence.

*It seems*, that, where one sustaining a fiducial relation to another is concerned in framing the latter's will to his own advantage, the instrument ought to be closely scrutinized, and that there is a presumption against its validity, strong or weak, according to the circumstances.

The testator, who died in 1880, by his will, executed in 1871, gave the bulk of his property, amounting to about $500,000, to an adopted daughter of his father, and to two of his aunts, K. and S. His nearest relatives living at the time of the execution, were a father, a half-brother, and four aunts. The probate was contested by the half-brother, aged thirteen years, mainly on the grounds of undue influence exerted by the husband of S., and a want of testamentary capacity. Mr. S. had long occupied intimate confidential and fiducial relations with testator; but, although his wife was a principal beneficiary, it was not shown that he drafted the will, or advised as to its contents, or even knew of testator's intending to make, or having made it. Testator was insane in the early part of 1873, when he became an inmate of an asylum in France; and he was of unsound mind at times thereafter, contestant insisting that the insanity was continuous after the date mentioned. A medical expert, who attended him at the asylum in 1873, would not undertake to state accurately his mental condition in 1871, but testified that, from his examination, and from what he then learned of his antecedents, from testator and from an aunt, B., he believed that the former was never in a condition of complete enjoyment of his intellectual faculties, or of balance in his nervous system. The information derived from B. was undisclosed by witness, and several of testator's declarations to him were against the weight of testimony; which was that testator manifested no irrationality until after 1871. A portion of the testimony,

taken on commission, of a witness acquainted with testator, tended to show original mental aberration, but this portion was in response to the final general interrogatory, was vague as to dates, and in some particulars as to meaning, and was not followed by cross-examination. Certain collateral relatives of testator had been afflicted with mental disease, but there was no evidence of insanity in his lineal ancestry. Letters produced in evidence, written by testator before 1873, were in the main clever and amusing, often instructive, particularly on art subjects, and at times poetical and elegant. By a will executed in 1869, testator had made dispositions, also, in favor of B. and his other aunt, who were not mentioned in the will propounded, and which made no bequest to contestant, or, with an insignificant exception, to testator's father.   Each of the two last named persons, however, had ample means.

*Held,* that the will was executed without undue influence on the part of Mr. S.; that its dispositions led to no inference of a disordered intellect on the part of the maker; that the latter was of sound mind at the time of its execution; and that it should be admitted to probate.

APPLICATION for the probate of decedent's will, by Francis H. Weeks, named as executor therein; opposed by Charles H. M. Bristed, a half-brother of decedent. The facts appear sufficiently in the opinion.

ROBERT W. DE FOREST, *for proponent.*

FREDERICK P. FORSTER, *special guardian for contestant*

WILLIAM E. CURTIS, *for Edith Kane, legatee.*

THE SURROGATE.—The admission to probate of the paper propounded in this court, as the last will and testament of the late John Jacob Astor Bristed, is resisted upon several grounds. It is claimed by the contestant that the evidence establishes:

1. That the instrument was not executed according to law.

2. That it is not in truth the will of the decedent, in that it is the product of such influence exerted upon him by his uncle, William E. Sedgwick, as is deemed in law "undue influence," sufficient to invalidate a will.

3. That, at the time of its execution, Mr. Bristed lacked testamentary capacity.

The decision of this case involves no novel or intricate question of law, but simply requires the application of well settled legal principles to the particular facts. I shall proceed, therefore, to declare my conclusions as briefly as practicable, without detailed reference to the great mass of testimony, the examination of which has occasioned my delay in passing upon these issues.

First. The first of the objections is that which relates to the factum of the will. It has not been pressed by contestant's counsel, and clearly has not been sustained by the evidence. The instrument was executed in November, 1871, and was offered for probate on June 30, 1880, Mr. Bristed having died during that month. The subscribing witnesses were George L. Lorillard and Townsend Harris. The latter had died before this instrument was propounded. His signature was proved and is not disputed. Mr. Lorillard testified that he signed his name as a witness, at the request of the decedent, who also, in his hearing, made a similar request of Mr. Harris. The three were together at the time, in the reception room of the Union Club. Mr. Lorillard saw Mr. Bristed himself subscribe his name to the paper, and heard him declare that it was his will. He also saw Mr. Harris sign as a witness. This shows a strict compliance with all the formalities prescribed by law.

Second. It is strenuously urged, by counsel for the contestant, that probate should be refused to this will, upon the ground that it was procured to be made and executed, by the undue influence of Mr. Bristed's uncle, William Elbry Sedgwick. It is not claimed that direct

and positive evidence has been adduced in support of this position.   But it is insisted that such undue influence should be inferred from certain circumstances ; mainly from the very intimate, confidential and fiducial relations which long subsisted between. Mr. Sedgwick and Mr. Bristed, and from the fact that Mrs. Sedgwick was made one of the principal beneficiaries under the will here propounded.   It has not been shown that he drafted this instrument, or advised with the testator about its form or substance, or knew of the fact that the deceased intended to make, or did make a will, during his visit to this country in the summer of 1871.   Indeed, there is such an absence of proof, either direct or circumstantial, upon this subject, that it would be more of a guess than an inference, to deduce from the evidence a conclusion that Mr. Sedgwick exerted any influence, whatever, upon the mind of the testator, to bring about the preparation and execution of this will.   If there be, however, proof of any influence at all, it is certainly not proof of such influence as the law deems "undue."

Says MILLER, J., in pronouncing the opinion of the court of appeals, in Children's Aid Society v. Loveridge (70. N. Y., 394) : "In order to avoid a will . . . it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity that could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist.   It must not be the promptings of affection, the desire of gratifying the wishes of another, the ties of attach-

ment arising from consanguinity, or the memory of kind acts and friendly offices."

And the same court says, in Cudney v. Cudney (68 N. Y., 152): "To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence; there must be evidence that he did exert it, and so control the actions of the testator, either by importunities which he could not resist, or by deception, fraud or other improper means, that the instrument is not really the will of the testator."

These are very recent expressions of the views of our highest judicial tribunal upon this subject. Tried by these tests, the claim that Mr. Sedgwick has been shown to have exerted undue influence upon the testator's mind is discovered to have no support. None of the numerous authorities which are noted on behalf of the contestant seem to me to be at odds with the decisions of the court of appeals above cited. Great stress is laid upon those cases which hold that, where one sustaining a fiducial relation to another, such as trustee, guardian, etc., is concerned in framing that other's will to his own advantage, the instrument ought to be closely scrutinized, and that there is indeed a presumption against its validity—a presumption strong or weak, according to circumstances. This is doubtless true. But it is only by arguing in a circle, that the ingenious counsel, who cites the cases referred to, makes them appear applicable to the case at bar. He first substantially infers the undue influence from the mere fact of the fiducial relations,

and then, having succeeded in thus establishing the existence of such influence, he claims the support of the judicial decisions which declare that the exertion of such influence, by one who holds a fiducial relation to another, is deemed suspicious in the eye of the law.

Third.  There remains to be determined the question whether, at the time of executing his will, the testator was of sound mind and memory, within the meaning of our statute of wills.  The evidence which bears upon this subject has been carefully considered, in the light of the able arguments of the respective counsel.  Nothing which is relied upon by contestant suggests to my mind a doubt of the testator's sanity in 1871, unless it be the testimony of Dr. Blanche.  That Mr. Bristed was insane in the early part of 1873 is not disputed by the proponents of this will.  Indeed, it is conceded that, from that date until the summer of 1874, and again from the spring of 1875 to the summer of 1877, and at times thereafter, the testator was of unsound mind.  It is claimed by the proponents that, in the interval between July, 1874, and March, 1875, and at some periods between August, 1877, and the date of his death, he was wholly or in part free from mental disease.  On the other hand, the contestant insists that, during all those intervals, his insanity continued.

If this will had been executed after February, 1873, the date when the decedent became an inmate of an asylum in France, I should feel some embarrassment in determining the question of his testamentary capacity.  But the evidence in the case does not justify me in finding that, at any time prior to the year 1873, the mental faculties of Mr. Bristed were seriously, if at all impaired.

Suppose that he had died on November 12, 1871, the day after he made this will, and that, upon a contention as to his sanity, the same evidence had been produced which is now before me (exclusive, of course, of that portion which relates to his career subsequent to November 12th). If such a contingency had arisen, I do not see how it could have been fairly claimed that the question of the testator's mental capacity was in the least involved in doubt.

The only medical testimony, to which I need make special reference, is that of Dr. Blanche, of Paris, as he alone refers definitely to the probable mental state of Mr. Bristed before 1873. Dr. Blanche, who had made a specialty of the study and treatment of insanity, testified before a commissioner that he saw the decedent, for the first time, on February 18, 1873, at Paris, and caused him to be conveyed to a lunatic asylum ; that Mr. Bristed remained there as a patient for a week, during which time he was under the frequent observation of the witness, who engaged him in long conversation as to the history of his life. It does not appear that he was ever seen by Dr. Blanche after February, 25th. The doctor states that, in his opinion, the decedent "was born under bad conditions of cerebral heredity, and had never been, even in his infancy, in a well balanced nervous condition, nor of a thoroughly sound judgment." The grounds of his conclusions he declared to be these : "From his infancy, John J. A. Bristed was subject to violent nervous crises (attacks), during which he uttered cries. He was never able to fix his attention continuously. He could not remember what he learned. At a later age, nevertheless, by means of travel, he was able to learn some languages,

but he said that he had entirely forgotten Italian. He had an extreme sensibility to music. He had habitually a certain vagueness in his mind. All these symptoms have increased since a severe typhoid fever with which he was attacked at Rome, in 1869. I have these particulars from Mr. John J. A. Bristed himself."

Dr. Blanche also testified that, aside from the information acquired by personal observations, he learned all that he knew of the testator from that gentleman himself and from his aunt, Miss Brevoort; that he would not undertake to state accurately what the testator's mental condition was in 1871, but from this examination in 1873, and from what was then learned of his antecedents, he believed that the testator "was never in a condition of complete enjoyment of his intellectual faculties, or of balance in his nervous system." Upon this evidence, the learned counsel for the proponent makes a criticism which seems to me well founded. It is to the effect that its whole value, so far as relates to the time when the will was executed, depends upon the truth of certain hypotheses, which have not been established as true by the evidence. The nature and extent of the information furnished to Dr. Blanche by Miss Brevoort, and which formed, in part, the ground upon which he based his conclusions, are not disclosed. But it is admittedly true that those conclusions are grounded, to some extent, at least, upon the declarations of the decedent, at or about the time when, according to Dr. Schule, to whose care he was committed when he left Dr. Blanche's charge, he was "not fully reliable in his statements, in consequence of his hypochondriacal anxiety."

Several of these declarations, and among them some of the gravest importance, are utterly at variance with the weight of testimony as to the intellectual characteristics of the testator.

The opinion of a distinguished alienist upon the probable mental condition of a patient, years before such patient had come under his observation, though entitled to respect, should be carefully scrutinized before acceptance, in a case like the present, where the opinion is avowedly contingent upon the correctness of hypotheses which have not been established by the evidence. Indeed, with the exception of a single witness to whose testimony I shall presently refer, by the universal assent of all persons who testified as to Bristed's demeanor and conduct prior to 1873, he appears to have been entirely sane. Nearly twenty people were called to the stand, mainly persons who had been more or less intimate acquaintances of the testator at various periods of his life, and had apparently been afforded good opportunity and possessed good capacity for observing him. The attention of many of them was specially directed to the month in which the will was executed. They agreed that no acts or declarations of the testator, prior to his departure for Europe in 1871, seemed to them irrational.

Mrs. Caroline Carson was examined at Rome, under a commission issued out of this court, upon contestant's application. Mrs. Carson was an American artist, "fifty years of age and upwards," as she testified, and had been an acquaintance and friend of the Bristed family. Five direct interrogatories were addressed to her. It was only in answer to the last interrogatory—a general inquiry as to whether she knew other matters or things

which would benefit the contestant—that she gave any testimony whatever touching Mr. Bristed's mental condition. The apparent purpose of examining Mrs. Carson, as disclosed by every question except the last, was to ascertain what she knew of the relations between the decedent and Miss Cecile Bristed. In response to that general interrogatory, she deposed as follows : " I knew John Bristed to have been naturally good-natured and well disposed, and I cannot think that he would have been guilty of the acts of violence, malice and eccentricity which I have known him to commit; if he had been in his right mind. As a little child, he was gentle and sweet-tempered ; but as he grew older, and ought to have become reasonable, he seemed to be bereft of reason. He would shriek like a wild Indian, and rush out of the house like a madman without any cause. He would play the piano for hours by day; and then get up in the dead of night and go on playing, always without sequence, like reading a newspaper sideways.  On returning home at night, instead of ringing the bell, he would throw stones at the house.  There were many other eccentricities too numerous to mention."   She then specifies an occasion, in 1868, when decedent while in anger " railed invectives" at his father until she herself successfully " ordered him to hold his tongue," and concludes by saying : " I saw him in 1877, when he was acknowledged a lunatic.   His talk was precisely the same I had always known it.   He was sweet, kindly and perfectly inconsequent, as he had always been in his best moods."

It is unfortunate that this testimony was given in response to the general interrogatory, as no opportunity was afforded for cross-examination.  The value of the

evidence could be far more accurately measured, if the dates of the various occurrences referred to had been fixed, and if definite explanation had been afforded of matters which manifestly need explanation, in order to be thoroughly understood. The statement that "he would shriek like a wild Indian, and rush out of the house like a madman without any cause," might perhaps be fairly interpreted as a reference to decedent's general habits at some period of his life, and as such might be deemed very important. But, from the absence of any corroborative testimony as to the course of such behavior on the part of the decedent, it would appear that Mrs. Carson must have had in mind some special occasion, and the failure to fix its date greatly impairs the strength of the evidence. The same criticism applies to the statement that, "on returning home at night, instead of ringing the bell he would throw stones at the house." If the witness meant that, as a custom, or as a matter of frequent occurrence, the decedent, when desirous of gaining admission to his father's house at night, used to throw stones instead of ringing the door-bell, such eccentricity of conduct would deserve attention in determining his mental condition. But if, as may, perhaps, be inferred from the testimony of Mrs. Gorman, the only occasion when he threw a stone at the house was when he was locked out, and desired to attract attention that he might be let in, the circumstance is unworthy of serious consideration. There is the same deficiency as to date, and also a certain vagueness as to meaning, in the statement that Bristed "would get up in the dead of night and go on playing the piano, always without sequence, like reading a newspaper sideways."

On the whole, therefore, I do not feel justified in attaching much importance to that part of Mrs. Carson's testimony which relates to the testator's mental capacity, especially in view of the opposing testimony of other witnesses.

A Mrs. Gorman lived for ten years as a servant in the house of Charles Astor Bristed, decedent's father. She was at Lenox, Massachusetts, when John visited his father there, in 1871. She says that "John sometimes forgot things and seemed a little nervous, or rather, would get into a passion about things that went wrong with him—about some little thing, his shirt perhaps." He sometimes seemed "queer," and by that she meant that he would "make a fuss over little things." He seemed very fond of his stepbrother, Charles, but liked to "make him yell." On cross-examination, the witness explained this by saying that Mr. Bristed would sometimes "pull at" her, and say he would strike her, so as to tease the baby, who was very fond of her.

Mrs. Geers was also employed as a servant in the house of Mr. Bristed, senior, in the summer of 1871, while John was in this country. She testified that "if things did not exactly suit him he would be a little nervous, and irritable, and cross;" that he was "a little forgetful at times;" that "his mother would bring things to his mind and find out that he would forget all about them." The frequency of this forgetfulness, or the nature of the matters brought by Mrs. Bristed to his attention, are not disclosed.

I have referred to this testimony, and to that of Mrs. Gorman, not because it seems very important, but for the sake of grouping the evidence of all the lay witnesses

who were called to describe testator's character and conduct. The weight of the evidence in this respect is decidedly in favor of the proponent.

Many letters written by the decedent to his relatives and friends were introduced at the trial. I cannot agree with contestant's counsel, in the belief that they tend to establish that their author was insane. To my mind, they furnish strong proof to the contrary—such of them at least as bear earlier date than 1873. It is unnecessary for me to make a detailed reference to these letters. The briefs of counsel contain very able and interesting analyses of their contents. They are in the main clever and amusing, often instructive, particularly upon art subjects; at times. poetical and eloquent, and in many instances enlivened by oddities and whimsicalities of thought and expression. But they do not seem to me to be tinged with insanity in the least degree.

The circumstance that certain collateral relatives of decedent, the descendants of his great-grandfather, have been afflicted with mental disease, throws little light upon the question—at what period of his life he himself first became its victim. Evidence that he had an hereditary tendency to insanity does not establish, of course, that such insanity was probably congenital, or that it declared itself at any particular stage of his career. And besides, the evidence does not disclose the existence of insanity among his immediate family or his lineal ancestry on either his father's or mother's side.

It only remains to consider contestant's claim that the mental unsoundness of the testator is indicated by the dispositions of the will itself. His nearest relatives, who were alive when the will was executed, were his

father, his half-brother Charles, and his four aunts, Miss Brevoort, Mrs. Coolidge, Mrs. Kane and Mrs. Sedgwick (wife of Wm. E. Sedgwick, who has been already referred to). Miss Cecile Bristed was then an inmate of his father's house, and had been adopted as his daughter. The principal beneficiaries under this will are Miss Bristed, Mrs. Kane and Mrs. Sedgwick, who are respectively given three-sevenths, two-sevenths and two-sevenths of nearly the whole estate, amounting to about $500,000. By his prior will of 1869, his aunts, Mrs. Coolidge and Miss Brevoort, were named as beneficiaries. They are not mentioned in the present will. In neither of these wills, is there any bequest to his half-brother, Charles, or, with an insignificant exception, to his father. The former, now about thirteen years of age, by his guardian, Mrs. Grace S. Bristed, the stepmother of the testator, is the sole contestant in this proceeding. There was much discussion, in the oral and written arguments addressed to me, touching the reasonableness or unreasonableness of the original will of 1869, and the wisdom or unwisdom of its revocation by the will of 1871, in view of certain changed conditions in the lives of his uncles and aunts. I have discovered no provision in either of those wills which ought not to be satisfactory to the court, if it suited the testator; and that, too, entirely aside from the question whether Miss Brevoort or Mrs. Coolidge had grown a little richer or a little poorer between 1869 and 1871. The testator had no wife, child, sister, brother, or mother. His father was a gentleman nearly seventy years old, and was possessed of means abundant for all his needs. His half-brother was a babe, entitled, in his own right, to half a million dollars, by the will of his

great-grandfather, John Jacob Astor.    His nearest relatives, aside from the two last-named, were his aunts. Courts are sometimes jealous, perhaps unduly jealous, of allowing testators to do what they will with their own. But I should have felt at liberty, under the peculiar circumstances of the present case, to sanction even an arbitrary selection by the testator, from among his aunts, of the particular one or ones whom he chose to enrich with his bounty.

There is nothing ungenerous, unjust, undutiful or eccentric about the provisions of this instrument; and it by no means exhibits any such violent departure from the natural course of human conduct as to suggest that it is the work of a disordered intellect.    And so, upon all the evidence in this proceeding, I find, as matters of fact:

I. That the instrument here propounded was properly executed by John J. A. Bristed, deceased, as his last will and testament, on November 11, 1871 ; that, at the time of its execution, the said Bristed was of sound and disposing mind and memory, and was under no restraint or undue influence of any person.

II. And I find, as matter of law, that the said instrument is the last will and testament of said Bristed, and should be admitted to probate as such.

Decreed accordingly.