NEW YORK COUNTY.—HON. RASTUS S. RANSOM,
SURROGATE.—January, 1889.

## MATTER OF BUSH.

*In the matter of the application for the probate of the
will of* CATHARINE L. BUSH, *deceased.*

At the time of the execution of the will of testatrix there were present the
draughtsman and four witnesses who testified as to what took place
substantially to the same effect, the only disagreement being as to the
order in which the witnesses signed the will. The will was written on
a printed blank and there was very little for the draughtsman to write.
The testimony was that he drew a table very near the bedside, a lamp
was set on it and testatrix "kind of raised up" and looked at him and
then called off the various sums she wished to have inserted in the
will. After he had finished, he said to testatrix: "Now you will
sign." She raised up and signed, and he then asked testatrix if she
wanted the witnesses to sign their names; she said: yes, that this was
her request, that she wanted the will read just as she had said. The
will was such a one as under the circumstances the testatrix would
naturally make. One witness testified that the will was read aloud to
the testatrix before and after it was signed, and at the time she said,
"Now at last it is done." Testatrix spoke to several witnesses as to
her religious feelings, and understood that she was in danger of death.
She had been ill for six weeks with typhoid fever, but not all the time
in bed. The will was executed two days before she died. Some evi-
dence was given that at noon on the day on the evening of which the
will was executed, and also at times on the two days following execu-
tion of the will, testatrix was "flighty." There was testimony that
she was of sound mind on the day of the execution of the will and the
day before. There was medical evidence that in cases of typhoid fever
where delirium exists it is intermittent, is most marked at night; that
it is not due to any organic change in the brain, and that between the
periods of delirium the patient is in a rational condition, and capable
of speaking rationally. *Held*, that testatrix had sufficient mental ca-
pacity to make a will.

APPLICATION for the probate of the will of Catharine
L. Bush.

MATTER OF BUSH.

WILSON & WALLIS, *for* JAMES MUNROE RICHARDSON, *proponent.*

T. McCANTS STEWART, *for* FRANK BUSH, *contestant.*

THE SURROGATE.—The masterly argument of counsel for the contestant greatly impressed me, and I took up the record for examination on final consideration strongly biased in favor of his contention. His conduct of this proceeding has been so admirable that I feel it to be my duty to commend him. He had apparently ample grounds for the contest, and he has throughout the case displayed all the qualities of a safe adviser and a skilled and eloquent advocate. He has been animated by motives resting on perfect good faith in the commencement of the contest, and his methods throughout have been honest and frank, and in his person we find complete refutation of the popular notion, that the colored race are incapable of attaining great eminence in all the walks of life. His appearance before me will always be welcome, as his unusual ability, learning and industry will greatly aid me in disposing of any proceeding in which he may be employed. Observations of this kind are unusual, although to my mind words of praise worthily bestowed by courts upon honest and able lawyers might well be written, and thus be an incentive to greater effort in professional labor, creating a spirit of emulation in all who pursue our honorable vocation. The gentleman here referred to, however, may properly be the subject of these remarks because of his race, and the unusual spectacle of a colored man who successfully copes with one of our most eminent and respected members of the Bar.

After a careful examination of the record in this

proceeding, and painstaking study of the strong briefs submitted on both sides, I am able to decide the real points in issue, to wit, the competency of the decedent to make a will, without doubt or difficulty.

The duty of the Surrogate in probate cases, as provided in our statute, is to inquire particularly into all the facts and circumstances, and he must be satisfied of the genuineness of the will and the validity of its execution, and if it appears to him that it was duly executed, and that the testator, at the time of executing it, was in all respects competent to make a will, and not under restraint, it must be admitted to probate.   Sections 2622 and 2623, Code Civil Procedure.

In this case I find abundant proof that the paper here propounded was duly executed by the testatrix, and that she was not under restraint.   In stating my reasons for the conclusion I have reached, I do not deem it necessary to give the testimony of the several witnesses upon either of these points.   It was not seriously contended by contestant's counsel that there is any proof of restraint or undue influence.   The real point, as I have said, is, in the words of contestant's counsel, "Was Catharine L. Bush, the deceased, at the time of the execution of the paper propounded herein, of sound and disposing mind and memory, and capable of making a will?"

The paper here propounded disposes of personal property only.   The precise question substantially stated by counsel for contestant, is raised under the statute of this state, which is as follows:

"Every male person of the age of eighteen years or upward, and every female of the age of sixteen years

or upward, of sound mind and memory, and no others, may give or bequeath his or her personal estate by will in writing." 2 R. S. 60 (8 ed., p. 2547), § 21, as amended by Laws 1867, ch. 782.

It has been said that "competency to execute a testament does not exist, unless the alleged testator has reason and understanding sufficient to comprehend such an act." Swinburne on Wills, Part 2, sec. 4; Marquis of Winchester's Case, 6 R. 23 a; Combe's Case, Moore 759; Herbert v. Lounds, 1 Ch. 12; Mountain v. Bennett, 1 Cox. Ch. 353.

This proposition is the settled law of this country, having been proved by numberless adjudicated cases.

Quoting from Lord KENYON, in Greenwood v. Greenwood, 3 Curteis (appendix) 2.

"Mind and memory competent to dispose of his property, when it is a little explained, perhaps may stand thus: Having that degree of recollection about him that would enable him to look about the property he had to dispose of, and the persons to whom he wishes to dispose of it, if he had the power of summoning up his mind so as to know what his property was, and who these persons were that then were the objects of his bounty, then he was competent to make his will."

Coke, in his note upon Littleton, section 405, defines one *non compos mentis* (aside from natural idiots, lunatics and drunken men) as "one that by sickness, grief, or other accident, wholly loseth his memory and understanding."

The rule laid down in the leading case of Delafield v. Parish, 25 N. Y. 9, is that the testator "must have

sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least, their obvious relations to each other, and to be able to form some rational judgment in relation to them." A testator who has sufficient mental strength to do these things, is, within the meaning and intent of the Statute of Wills, a person of sound mind and memory, and is competent to dispose of his estate by will."

In Jackson v. King, 4 *Cow.* 207, it was held that the law recognizes no incompetency but that of idiots, lunatics, and persons *non compos mentis,* giving to the latter the description already cited from Coke—Littleton. This case also explains incapacity as applicable to "not a partial but an entire loss of the understanding."

In Odell v. Buck, 21 *Wendell* 142, the plaintiff claimed under a deed to him from Levi Buck and his wife. The defence was that Buck, at the time the deed was given, was incompetent to contract, on the ground of idiocy or insanity. The case turned wholly on the incapacity of the grantor to contract. The court followed Jackson v. King, *supra,* and held that no part of the evidence established a total want of understanding; that the grantor was a man of weak mind, but neither a lunatic nor a fool, and sustained the deed.

In Blanchard v. Nestle, 3 *Den.* 37, at page 41, the court by JEWETT, J., repudiate the proposition that, " although the testator had not wholly lost his memory and understanding, yet that he was from *mere weak-*

*ness* of mind, in contemplation of law, of *unsound mind* and for that reason within the exception of the statute. It is enough to say that the law makes no such distinction. There is no grade of understanding between the highest and the lowest which incapacitates a testator when there is no fraud or imposition."

The court further says, " It (the law) holds that weak minds differ from strong ones only in the extent and power of their faculties, but unless they betray a total loss of understanding, or idiocy, or delusion, they cannot properly be considered unsound."

The court quotes with approval the language of Lord HARDWICKE, *Ex parte* Barnsley, 3 *Atkyns* 168, as follows : " Being *non compos*—of unsound mind—are certain terms in law, and import a total deprivation of sense. Now, weakness does not carry this idea along with it, but courts of law understand what is meant by *non compos*, or insane, as they are words of determinate signification."

The same principle enunciated in Blanchard v. Nestle, *supra*, was applied at the same term of court in the case of Osterhout v. Shoemaker, 3 *Den.* 37 n. The trial judge charged the jury that in order to avoid the deed (which was attacked upon the ground that the grantor was of unsound mind when he executed it) that the plaintiffs must show that the grantor was *non compos mentis* at the time of the execution of the deed, within the legal meaning of the term, and the jury found affirming the validity of the deed. On appeal to the Court of Errors, Chief Justice BRONSON, delivering the opinion of the court, said : " Our law does not distinguish between different degrees of

intelligence. It does not deny to a man of very feeble mind the right to make contracts and manage his own affairs. In the absence of fraud, proof of mere imbecility of mind in the grantor, however great it may be, will not avoid his deed. There must be a total want of understanding."

In Rambler v. Tryon, 7 *Serg. & Rawle* 90, as to making a will the court said: "There is *no standard* by which the understanding is to be weighed but one. Has the party such a portion of understanding as will enable him to do any *binding* act?"

In Kinne v. Kinne, 9 *Conn.* 104: "Had he an understanding of the nature of the business he was engaged in, a recollection of the property he meant to dispose of, and of the persons to whom he meant to convey it?"

In Harrison v. Rowan, 3 *Wash. C. C. R.* 580, "A testator's capacity to dispose of his property by will may be perfect, and yet very inadequate to the management of other business, as to make contracts for the purchase or sale of property. It is not necessary that he should comprehend the will's provisions in their legal form. It is sufficient if he has such a mind and memory as will enable him to understand the elements of which it is composed, the disposition of the property in its simple forms."

Applying the principle established by the authorities here cited, which might be multiplied indefinitely, to the case at bar, there is no doubt in my mind upon the evidence but that the testatrix, at the time she executed the paper propounded as her last will and testament, was *compos mentis*, or in the words of the

statute, *supra*, was of sound mind and memory at that time.

Such stress is given by counsel for the contestant to the fact, which I see no reason to dispute, that on Monday noon, the testatrix was, in the language of the witness, in "*a delirious state;*" that is to say, the opinion of the witness who saw her at that time after a description of her actions, was that she was then in "a delirious state." A credible witness also testifies that on Tuesday, the day after the paper propounded was executed, and the day preceding the day of the death of the testatrix (which occurred at about 6 o'clock P. M.), to her condition generally, and to some "flighty" remarks, from which it is evident the witness thought she was at that time "out of her mind." On the following Wednesday morning, the day of her death, this same witness called at the room where the testatrix lay sick, and in answer to her question : "How is Katy this morning?" was informed by Mrs. Moore, the testatrix's aunt, "Katy is much better," and that she had eaten a bowl of soup. The witness says at that time the testatrix did not notice her at all, nor any one else. The testimony of this witness in regard to an interview had by her with the testatrix on Sunday previous to the day of her death satisfies me that at that time (2 o'clock in the afternoon) the testatrix was in perfect possession of her mental faculties, and that the witness, then at least, had no suspicion that she was then, or would become in the near future, a mental wreck.

The conversation testified to by this witness between herself and the testatrix on Sunday was entirely

natural between intimate acquaintances, and was wholly upon the subject of the testatrix' illness, and she expressed her sorrow to see her sick. "You know why I have been looking for to see you come to see me for all the week." The testatrix, it seems, mildly reproached the witness for not having called before to see her, and the witness answered: "Katy, old girl, I really could not get away every day; you know I have got to go back. I am sorry that you are so sick, and I hope that as you are so sick you will try to pray." The testatrix laughed and said: "All right, Di; I am going to."

This witness is the sister of the contestant (the husband of the deceased), from whom she had been separated ten years or more, previous to her death. It cannot, therefore, be said that she is wholly disinterested in this contest. However, I have no doubt of her intention to testify to the truth substantially, and her testimony tends to establish the fact that near to the time of the testatrix' death she was very ill, and that probably fifteen hours subsequent to the time when the paper propounded was executed the testatrix was in a "flighty" condition, and from her talk and speech impressed the witness that she was then in "a delirious state."

The testimony of the uncle of the testatrix in regard to her condition on Tuesday is to the same effect. So also is the testimony of the witness Mrs. Edwards, who says that she saw the testatrix on Tuesday, and that she seemed to be a little "flighty."

The testimony of the witness Mrs. Manning, upon which the contestant relies very strongly, shows that

she visited the testatrix on a business errand on Sunday previous to her death. Her business was to obtain from her the bank book and other papers belonging to some society of which the testatrix had been, or was then, treasurer. Her account of her interview with the testatrix at that time clearly shows that she was then in perfect possession of her faculties, and that she carried on a conversation in regard to the business in a rational and sensible manner. The witness delivered to her a note which she had from some officer of the society, requesting her to deliver to the witness the book, and at the same time the witness told her what her errand was, and the testatrix answered that she was not " able to give it to me now, and she told me to call Monday and I could have it."

On the following Monday, near twelve o'clock, this witness called upon the testatrix, pursuant to the arrangement made between them the day before, for the bank book, and was there from an hour to an hour and a half. She states that she was given the book by Mrs. Moore, who is the testatrix' aunt, and that at the time she left her, Monday, she was " calm " and " quiet " but that she was not asleep; that she did not act as though she was asleep, although she might have been; that she could not say positively whether she was asleep or not, but she might have been.

I find nothing in the testimony of this witness which tends to impeach the mental capacity of the testatrix on either of these two visits, but, on the contrary, she fully establishes the fact that the testatrix was then in possession of her faculties, to a degree, at least, rendering her entirely competent to make a will.

On Tuesday, the day following, this same witness called again, and her testimony of what she saw coincides substantially with the other witnesses, whose testimony has already been referred to.

Thus it will be observed that we have no evidence entitled to consideration and credit from a single witness who was present at the time the paper propounded was executed, Monday night at six o'clock, giving us any information whatever in regard to the testatrix' mental condition at that time, (except those produced and examined by the proponent,) who were present at the time the paper was prepared and executed.

Two physicians of eminence were examined in this proceeding ; one at the instance of the contestant, and one at the instance of the proponent. They do not in any substantial manner disagree. Neither testifies from a personal examination of the testatrix, but only upon hypothetical questions propounded. Their testimony establishes the fact that persons afflicted with the malady which carried off this testatrix (typhoid fever) are at times during the course of that disease delirious, but that such delirium is intermittent. The condition of a patient described by one of these physicians as " *coma vigil*," (which expression in the opinion of the other physician is not now in common use,) does not appear to have been proven to have been that of this testatrix. Hence, his opinion in respect of a person in that condition, as to soundness of mind and memory, is not material.

The proof from the medical experts satisfies me that delirium is common, but not invariable in this

disease, and that when it does occur it is intermittent and generally most marked at night, and is not due to any organic change in the brain, and that between periods of delirium the patient is in a rational condition, capable of speaking rationally.

A learned judge of our court of last resort, with whom I entirely agree, has said in respect of testimony of this character as follows: "The medical disquisitions of men learned and eminent in that profession are no doubt interesting as matters of general information, and even as the arguments of medical counsel, and are illustrations of the zeal and positiveness with which ' doctors disagree ' upon subjects on which all human knowledge is imperfect and which will continue to be shrouded in mystery until we see ' face to face, and know even also as we are known." But these essays are not in any sense evidence.   Personal or professional eminence does not constitute either a lawful court or a jury; and therefore they are not to give a decision in this case.   The experience of courts has, however, not found this to be the safest kind of testimony.

However, the medical testimony, in this proceeding, read in connection with that given by proponent's witnesses, describing the condition of the testatrix at the time she executed the paper propounded, fully corroborates it and materially strengthens the proponent's contention that at that time she was of sound mind and memory.

The opinions of all the lay witnesses who have testified in this proceeding are not legally competent upon the general inquiry whether the mind of the

testatrix was sound or unsound. Such witnesses may be examined as to facts within their own knowledge and observation, and they may characterize such acts and declarations of the testatrix testified to by them as rational or irrational. An exception, says the court in Clapp v. Fullerton, 34 *N. Y.* 195, is recognized in the case of attesting witnesses. They may be " required to state not only such facts as they remember, but their own conviction as to the testator's capacity; for it may well happen that on so vital a point they may retain a clear recollection of the general result long after the particular circumstances are effaced by lapse of time or obscured by failing memory."

We come, then, to a consideration of proponent's case. First, it is proper that we should consider the dispositions of the will itself and ascertain whether, under all the circumstances it is such a will as the testator would naturally have made. In this case there can be no doubt on the question. For many years she had lived apart from her husband. The precise cause is not given, but evidently by mutual consent, and during her lifetime she had been very industrious and saving and had accumulated a moderate sum, which she disposed of by the terms of the paper propounded in a perfectly natural and proper way, as it seems to me, giving four fifths of it or more to her own kin.

At the time the paper propounded was executed by the testatrix there were present the draftsman of the paper and four other persons, all of whom have testified in this proceeding; the four of whom other than the draftsman, to what took place at the time the

paper was prepared and signed by the testatrix and by her attesting witnesses. The testimony of the attesting witnesses agrees in every respect except as to the order in which they signed their names. I am satisfied, upon the whole case, that the witness, Mrs. Harris, was mistaken in her recollections that she signed her name as a witness before the testatrix made her cross-mark. It is probable from the evidence that the draftsman had been, at some time prior to the execution, requested by the testatrix to draw her will. The paper was drawn upon a stationer's blank, and there was very little for the draftsman to write. The testimony is that he drew a table very near to the bedside, a lamp was set on it, and that the testatrix " kind of raised up and looked at him ; then she called out the different sums, and after he had finished he said, ' Now you will sign,' and she raised up and signed her signature, and he then asked the testatrix if she wanted the attesting witnesses to sign their names, and she said ' Yes,' and that the testatrix said that this was her request, that she wanted the will read just as she had said."

One of the attesting witnesses testified that the testatrix was a woman of sound mind ; and that she was with her during her entire illness and until she died. She had been sick six weeks, but not confined to her bed all the time, and that she did not at the time the will was executed, talk in any way different from her ordinary manner.

These witnesses were very thoroughly cross-examined, but such examination served only to strengthen their testimony as to the entire competency of the

testatrix. They detailed conversations at and about the time the will was executed with her " in regard to her soul." It clearly appears that she fully realized her extremity and expressed herself as well prepared to die ; in her own words, " it was well with her soul."

One of the subscribing witnesses testifies positively that at the time this paper was prepared the testatrix told the draftsman that she wanted him to " write this will for her." He wrote as she told him to write about the money ; as she told him he wrote it down on a table near the bed, as close to the bed as he could get, and when he got through she signed her name— her cross-mark—and after the signing was complete she was asked by the draftsman " if she was satisfied with the will, and she said yes ; " and she said ; " At last you have done what I asked you to do."

This witness also testifies that the will was read aloud to the testatrix before and after it was signed, and at the time she said, " Now at last it is done."

One of the subscribing witnesses lived with the testatrix in the same house nine years, and was a personal friend. Neither she nor the other subscribing witnesses appear to have the slightest interest in this contest. The witness who had known her for these nine years thus intimately testifies that she never saw her out of her head ; and she further testifies that after the will was executed all " the persons went up to the bed and spoke to the testatrix, who only said she was a little better."

She further testifies that on Wednesday, the day of the testatrix' death, about 3 or 4 o'clock in the afternoon the testatrix spoke to her about her soul, and

said it was "well with her soul," and these were her
last words to her, the witness.

A witness was called by the proponent, one Annie
Elizabeth Moore, and her testimony at that time en-
tirely sustains and corroborates in all respects the tes-
timony of the subscribing witnesses.

A daughter of one of the subscribing witnesses, a
little girl of 16 years of age, who was present at the
time the paper propounded was prepared and exe-
cuted, also fully corroborates the subscribing witnesses.
Much adverse criticism of this witness was indulged
in by counsel for the contestant in argument.   I am
unable, however, to find such criticism warranted.
The most that can be said is that she spoke floridly
and expressed herself inaptly.   But on examination
of the testimony I observe that the strong expressions
imputed to her really fell from the lips of examining
counsel, who incorporated them in his questions, to
which she assented.   On the main question as to the
speech and conduct of the testatrix at the time the
paper was executed, this witness undoubtedly spoke
truthfully.

The witness Mrs. Moore was called by the contes-
tant and testified in the very teeth of her testimony
given to the proponent, contradicting it in every es-
sential particular.   The conclusion that this woman
has committed wilful perjury in this proceeding is in-
evitable.   She is utterly unworthy of belief, and I
attach no weight whatever to her testimony for either
side.

Finally, I unhesitatingly accept as the truth the
evidence of Mrs. Tucker and Mrs. Harris, the sub-

scribing witnesses, and the daughter of the former, as to the condition of the testatrix all day Monday and down to the moment the will was signed. They do not disagree in any material sense, nor do they describe her condition to have been such as Dr. Terhune testifies as "*coma vigil*," nor does the doctor pretend to give an opinion of her mental capacity at the time, based upon her condition of mind and body as it then appeared to these witnesses. The hypothetical questions of contestant's counsel answered by the doctor are not warranted by any testimony worthy of belief. It seems to rest entirely upon the evidence of Mrs. Moore, given before she was called by him.

In Horn v. Pullman, 72 *N. Y.* 276, the Court of Appeals says: "There is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme; and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of the testator, and he has sufficient intelligence to comprehend the condition of his property, and the scope, meaning and effect of the provisions of the will."

As I have already said, there is no evidence which tends to sustain the charge of fraud or undue influence. If it be the fact, as insisted upon by counsel for the contestant, that the testatrix held the draftsman of this will in high esteem, and love, if you please, and was thereby induced to make the testamentary disposition in his favor, which she did, such

motives on her part cannot ordinarily be considered as arising from his undue influence.

The Court of Appeals in Children's Aid Society v. Loveridge, 70 *N. Y.* 395, says : " All these motives are allowed to have full scope, without in any way affecting the validity of the act.   So, also, lawful influences which arise from the claims of kindred and family, or other intimate, personal relations, are proper subjects for consideration in the dispositions of estates, and if allowed to influence a testator in his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation."

The paper here propounded must be admitted as the last will of the decedent, Catherine L. Bush.