(*Surrogate's Court, New York County.* December 24, 1890.)

1. WILLS—CAPACITY TO MAKE—LUCID INTERVAL.
    On an application for the probate of a will it appeared that in November, 1886, testator was confined in an insane asylum, being afflicted with a brain disease known as "general paresis." In October, 1887, he was taken out of the asylum, and in March, 1888, he intermarried with proponent. It was not objected at the time that he was incompetent to make a marriage contract. The will was executed a few months after testator's marriage. About a year after its execution testator was again confined in the asylum, where he remained until his death, which occurred 10 months later. A number of witnesses, some of them medical experts, testified that testator was not competent to make a will. A somewhat larger number testified that in their opinion testator was competent. One witness had taken a conveyance of land from testator at the time when, according to his testimony, he considered testator incompetent. From the time that testator was released from the asylum until he was again confined he managed his business. *Held*, that testator was competent when the will was executed.

2. SAME—EVIDENCE.
    On the issue of the competency of a testator, the testimony of witnesses who have seen him in his daily life, and had business and social transactions with him, is entitled to greater weight than the testimony of medical experts.

3. SAME—NATURAL DISPOSITION.
    Testator gave his widow a life-estate in all his property, and, after her death, legacies of $5,000 each to her two sons by a former marriage; the residue ($10,000) to his children; but, if he left no children, then to his brothers and sisters. *Held*, that such will was just and natural.

Application for the probate of the will of Andreas Kiedaisch, deceased. On the issue of the mental capacity of the testator it appeared that in November, 1886, the testator had been confined on the commitment of two physicians in the Bloomingdale Insane Asylum, as being afflicted with a disease of the brain known as "general paresis," and that he was retained there up to the month of October, 1887, when he was taken out by his relatives; that the testator, subsequent to his removal therefrom, and in the month of March, 1888, intermarried with the proponent, a widow, having two minor sons, with whom he had been acquainted nearly all of his life-time, and that a number of his relatives, family friends, and neighbors were present at the marriage ceremony, and enjoyed the festivities of the wedding, including some of the witnesses in this matter, who testified on behalf of the contestants; and it appeared from the testimony of a large number of lay witnesses and of several medical experts who testified on behalf of the contestants, all of whom impugned the man's capacity, that he was, in their view, incapable of executing a will valid in its character, or of executing a valid contract of any kind, or entering into any business transaction, or performing any business act, from about the time he was sent to Bloomingdale until the time he was released; and from the testimony of some of the witnesses on behalf of the contestants it also appeared that, to their view, the man was incapable and insane down to the very time of his marriage; and that in the month of June, 1889, almost a year after the execution of the said will, the said testator was again confined in an asylum for the insane at Amityville, L. I., on the certificate of two physicians, at which asylum he remained, with the exception of two or three months, until his death, which occurred in said asylum in April, 1890; while on the other hand a large number of lay witnesses who were present at the

wedding, and who had an opportunity to observe his conduct at that time and for several months previously thereto, and who also observed his conduct and acts for more than a year thereafter, and others who had transactions with him of a social character, as also in business, including also the pastor who had performed the marriage ceremonies, testified to his soundness of mind at about the time of the execution of the will, and for almost a year thereafter. And it also appeared that he collected the rents of his real estate, and generally managed the same. Testator, by the will in question, gave his widow an estate for life in all of his property, and, upon her death, two legacies in the sum of $5,000 to each of her two sons, and the residuum, amounting to about the sum of $10,000, to any child that might be born of his marriage; and, in the event of the failure of issue, the said residuary estate to vest in his brothers and sisters in equal shares.

*George Haas* and *E. I. Spink,* for proponent.    *Rudolph F. Rabe, Edward Browne,* and *David Welch,* for contestants.

RANSOM, S., (*orally.*) I have given very careful and painstaking attention to every word of the testimony in this proceeding, and I have listened with a great deal of interest to the careful statements, by both counsel, of the law, and in the main I agree with them. The duty of the surrogate is made very clear by our statute. This proceeding presents but a single question of fact to be determined. It is conceded that the paper propounded as the last will of this decedent, Andreas Kiedaisch, was executed by him on the 13th day of July, 1888. It is also conceded that he died in Amityville, a home for insane people, commonly called an "asylum," on the 14th day of July, 1890. What its precise name is I do not know, and it is of no consequence. There is no evidence of what disease or malady he died. I recall no evidence on the subject at all. It has, perhaps, been left for me to infer, from the fact that he was sent there under the commitment and died there, that he died an insane man. It is not necessary for me to express any opinion upon that subject at all, and I do not. I think it is entirely immaterial. The contest has been very carefully, very candidly, and very ably presented; and I have no doubt at all about the absolute good faith of the contest, and it should have been instituted by the persons interested in this estate. The facts in regard to this man's condition about the time that he made this will, which have been disclosed by the testimony, amply justify a very careful inquiry into his mental capacity on the date of this instrument. The witnesses on both sides have been, in my view, exceptionally honest, candid people. I do not recall the testimony of a single witness that should be discredited *in toto.* I believe that the witnesses intended to speak the truth; and such mistakes as they may have made, and no doubt did make, on both sides in regard to the matters they testified to were natural, and in no way make against their candor or the credence to be given to their testimony. The Code, which is our statute on this subject, provides, at section 2622, that it shall be the duty of the surrogate before he admits a will to probate to inquire particularly into all the facts and circumstances, and he must be satisfied of the genuineness of the will and the validity of its execution; and the following section (2623) provides that, if it appears to the surrogate that the will was duly executed, and that the testator at the time he executed it was in all respects competent to make a will, and not under any restraint, it must be admitted to probate. In this proceeding the issue is presented by the second objection filed to this paper, in these words: "That neither at the time said will purports to have been executed, nor at any time when it was executed, if ever executed, was he of sound mind, memory, and understanding." All other objections which appear in the answer filed have not been regarded by the counsel for the contestant, and are not regarded by me, as the subject of comment or disposition; and the only question, as I say, is included in that objection. I am not re-

quired by the law to state my reasons for the decision which I feel it my duty to make in this case, nor, indeed, am I required by law in any probate case, except under certain conditions, which do not obtain here, to state my reasons; but it is my conception of duty, sitting as judge and as a jury, upon a question of this sort, to state briefly, in all cases, the reasons for my conclusion, sometimes at the risk, perhaps, of reaching a right conclusion, though giving the wrong reason, but that risk I am always willing to take, because to change places with those who are interested—aside, I mean, from counsel—to change places with those who are interested in the estate, either for the will or against it, in their place I should be better satisfied to see the mind of the judge, if I could, as he disposes of a question of such interest to me. This case has taken a great many days to try. It has been very carefully and very ably presented on both sides. The question is one of importance in a pecuniary sense to the beneficiary named in the will, and to the kin of the decedent. I have had occasion to examine all the questions which are presented in this case heretofore very carefully. Several cases have been decided by me which have not been referred to by counsel, and in which I had at the time studied the questions with great care, and came to my conclusions, and cited authorities which seem to have sustained the views expressed; and those cases are the law of this court, because they have never been reversed, and of course they stand as the law here, unless for some reason I myself see that I have been mistaken. I said (and I again say in this case) in February, 1889, in *Lissauer Will Case*, 5 N. Y. Supp. 260, (which will was rejected upon the ground of incapacity,) that the rule of decision in this state is that, if there be a reasonable doubt whether one or more of the directions of the statute have not been complied with, then probate must be refused, even if it appear probable that the paper expresses the testator's intention. That remark was more properly applied to the ceremonies of the execution of the paper; and in this case there is no dispute about the due execution of this paper,—the formalities required by the statute. The will was signed by this man, and signed at the end of the paper. It was signed in the presence of two subscribing witnesses. In other words, all the formalities of the statute were complied with. One of the subscribing witnesses is dead, and it is certain if he was here he would speak more closely of the condition of the man at that time than perhaps any other witness who has testified, or any other person living. The other witness was a stranger to the decedent, and he testified cautiously, and testified necessarily, because he was a stranger to the testator, to the bare facts which the statute requires; and his testimony is equivalent to a negative affirmation of capacity on the part of this testator. He saw nothing that satisfied him or caused him to suspect that the man was incapacitated to execute the paper; and he at least saw that he appeared to be in robust health, and stated that the decedent thanked him for his coming in to sign the paper as a witness, and departed. He saw nothing in his eyes that indicated that the man was incapable.

Ordinarily the burden of proof, which is upon the proponent always, to satisfy the court that the paper propounded was executed by a person capable at the time of making a will, is successfully carried by the testimony of the subscribing witnesses. They are the persons who have the best opportunity of judging of the condition of the testator's mind and of his surroundings; and the law has wisely (we all think) given these witnesses the right to testify to their opinion of the testator's mental capacity at that time. No other lay witness has that right for obvious reasons. The law is, as I view it, and applicable to this case, well stated in the case of *Weir* v. *Fitzgerald*, 2 Bradf. Sur. 42, where the court say: "Something more is necessary to establish the validity of the will, in cases where from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inferences cannot be drawn from the mere formal execution. Additional ev-

idence is therefore required that the testator's mind accompanied the will; that he knew what he was executing, and was cognizant of the provisions of the will." That proposition, I suppose, will not be disputed by anybody; and it applies forcibly to the case we are now considering. The situation of this man shortly before the execution of this paper and shortly after July 13, 1888, when it was executed, as I have already said, justified a careful, and, indeed, demanded a very careful, examination into his history and his walk in life, private and public, as far as it is possible to get it, during that period of time; and, considering the fact of the death of one of the subscribing witnesses and of the strangeness of the other, together with the condition of the testator, as I have described it in my judgment, it casts upon the proponent in this case, from the beginning to the end, the burden of satisfying the surrogate beyond a reasonable doubt that the man was capable of executing a will at the time he executed this paper; that he could comprehend the nature of his property, what it was, how situated; and also appreciate and perceive the relations of those who were entitled to his bounty and to benefactions from him. The surrogate must be satisfied of all these facts, and in this case it was the duty of the proponent to satisfy him. The question is whether or not the evidence should, as matter of law, dispose of that question in favor of sustaining this paper or of rejecting it. Counsel for the proponent has stated very correctly that it is not the quantity (if I may use that expression) of capacity that we may inquire about. It is not necessary that the man should have the capacity to transact all kinds of business to be esteemed capable of executing a valid will; and I shall detain you for a minute by calling your attention to some authorities which were used by me in *Will of Bush*, 5 N. Y. Supp. 23, which was decided in January, 1889. Lord KENYON said, in a case which was reported in 3 Curt. Ecc. App. 2, (*Greenwood* v. *Greenwood:*) "Mind and memory competent to dispose of his property, when it is a little explained, may perhaps stand thus: Having that degree of recollection about him that would enable him to look about the property he had to dispose of, and the persons to whom he wishes to dispose of it, if he had the power of summoning up his mind so as to know what his property was, and who those persons were that then were the objects of his bounty, then he was competent to make a will." I think our statute says that every male person of the age of 18 years or upwards, and every female of the age of 15 years or upwards, of sound mind and memory, and no others, may give or bequeath his or her personal estate by will in writing. Well, the question is, what does our statute mean by a man of sound mind and memory? It has been decided, and it is the law, I think, that such a man is aptly described as *compos mentis*, and that a man without sound mind and memory would be aptly described as *non compos mentis;* and since the law existed, it has been held that a *non compos mentis* was an imbecile, a lunatic, or an idiot, and not a person of merely impaired mental faculties. A man whose mental faculties are weakened or impaired, even to a considerable degree, is not *non compos mentis* within the legal definition of that term, applied to the act we are now considering, viz., the making of a will. That is the law as laid down in the leading case of *Delafield* v. *Parish*, 25 N. Y. 9, and in the old case of *Jackson* v. *King*, 4 Cow. 207, where it was held that the law recognizes no incompetency but that of idiots, lunatics, and persons *non compos mentis;* giving the description there cited from Coke-Littleton of "incompetency," (and which is applicable to the case that we are now considering,) as not a partial, but an entire, loss of understanding. I could continue, of course, to multiply precedent decisions to sustain this proposition that was stated in argument by Mr. Spink, and not denied, of course, by Judge Browne,—that we must find in this case that this man was without capacity, that he was *non compos mentis*, and that he had no understanding; and of this you must satisfy the surrogate beyond a reasonable doubt; oth-

erwise this paper propounded must be admitted to probate. And so we come down to the testimony.

I have already said that I have entire confidence in the good faith and honesty of all of these witnesses. Never, in my experience, have I known 25 or 30 witnesses to testify against each other where, to my mind, although the conflict was rather sharp in some respects, I felt that they were all endeavoring to tell the truth. The will itself is an item of evidence. It has been referred to briefly by counsel. It is always to be considered, and it is always an important item of evidence. Considering the man's surroundings and his relations to the world, and his relations to his family and kindred, is the paper propounded in a given case a natural will? Does it seem to be consistent with what would be the natural feeling and sentiments of a testator? Well, in this case, I think this is a very natural will, and a very just will. The man had an undoubted right, so far as the moral ground of the question is concerned, to contract a marriage. He had the legal right to contract that marriage if he were a sane man. That he was regarded by his family, friends, and his neighbors, who have been called here as witnesses, as a proper subject of matrimony, must be admitted by all; for all these people—his relatives, and those who have testified against his capacity at that time—were present at the wedding, and enjoyed the festivities, and congratulated him upon the act. That is, I think, a justifiable comment upon their testimony in this case against his capacity, not to impeach them or to discredit them, but to explain what has been called in the case the reason for a little exaggeration or romancing, a florid sort of statement that came from the witnesses on this trial, which is not consistent with their conduct at the time of this wedding. And another item of evidence which was not commented upon by either side is, I think, significant of the state of mind of the persons who were most intimately associated with this man at the time of his marriage, or about the time that we are considering, namely, the sale by him to his brother-in-law of his property. Surely neither Mr. Volm nor Mrs. Volm had any idea that the man was insane, and incapable of making a valid transfer of this property at that time; and that was the time when they were best able to judge of his condition. If they had, they certainly would not have dealt with him, because I do not believe, from the testimony, that either Mr. Volm or Mrs. Volm are capable of overreaching or defrauding anybody, or attempting to do it; and, if the man was insane at that time, and incapable of making a will, then the sale by him to Mr. Volm, his brother-in-law, was a fraud in law on the part of the latter. The number of witnesses on each side of this controversy who observed this man during the period covered by the inquiry seems to have been about the same. The interest of the witnesses in the result of the controversy may be about the same. I do not believe that a single witness has had any interest in this controversy, except to see it properly and righteously decided. A number of the witnesses were called by the contestants, and (without going over their testimony one by one, which would be an unwise and unnecessary thing for me to do,) they called many lay witnesses, and some expert witnesses, whose testimony, taking it as an entirety, impugns this man's capacity, and represents him as incapable of executing a will valid in its character, or of executing a valid contract of any kind, or entering into any business transaction, or performing any business act, from about the time he was sent to Bloomingdale until the time he was released. The dates I do not mention, because I do not recall them. Some of the testimony from contestants establishes the fact that, to their view, the man was incapable and insane down to the very time of his marriage,—the very day; but the wedding, and the evidence upon that point, is largely against their belief; and that is all their testimony amounts to, as what they believe on that subject. There is no doubt in my mind at all from this testimony, too, that the man was *compos mentis* at the time he was married; and that he not only was *compos*

*mentis* at the time, but that all of his friends, and the witnesses, the relatives, including these people, these contestants, believed him to be *compos mentis* at that time.

Counsel for the contestants have referred to the value of expert testimony. I think I ought, in justice to him, to state that the law, as I remember it as it has been laid down in our state, and I have cited it, is not as he supposes. I know that our court of appeals, in a case which I supposed I had under my eye, condemns the testimony of medical witnesses where it is produced against the testimony of witnesses—lay witnesses—who have actual view of the person whose capacity or sanity is the subject of controversy. The court said in that case: "The medical discussions of men learned and eminent in that profession are no doubt interesting as matters of general information, and often as the argument of eminent medical counsel, and are illustrations of the zeal and positiveness with which doctors disagree upon subjects upon which human knowledge is imperfect, and which will continue to be shrouded in mystery until we see face to face, and know even as we are known." That is the language of the opinion; and I think Judge Browne will agree with me that the testimony of experts, although admissible always, and a great aid to a court and jury in discovering where the truth lies, in a question of this kind, cannot ever be held to be conclusive and controlling against the testimony of those persons of intelligence who saw the man daily and who had transactions with him of a social character and in business. Dr. Brill, whose testimony was very strongly relied upon in argument, examined this man in November, 1886, and knew nothing about him two years thereafter, when he made this will. His testimony may be absolutely true, and, for the purposes of this case, it is safe and proper to admit, if you please, that it is true. The evidence in this case satisfies me, and I think it must satisfy everybody, that this man might have and did have a lucid interval at that time; and that a will may be made in a lucid interval, of course, is established over and over again. It is not necessary to quote any authority for that. The fact that this man had been committed to a lunatic asylum may be presumptive evidence of his insanity, although that it is controverted by Mr. Spink, (and I am inclined to think that he is right about it,) but for the sake of the case we will admit that. I have a case here in 5 N. Y. Supp. 849, (*In re Pendleton*,) where the will of a person (who, at the time the will was made, was under the care and custody of a commission in lunacy) was admitted to probate. That, however, proves nothing. That case is no authority to us, except that the existence of the commission in lunacy was not regarded as conclusive at all upon the question of capacity. As to that, the court inquired independently, and came to the conclusion that the lunacy commission was wrong, and that the woman was sane, or that she had a lucid interval. The number of witnesses called by the contestants to sustain their case, by count —if we were to count them, and to thus talk about the weight of evidence— falls some five or six short of the number called by the proponent upon the very same question. There was one witness in this case whose testimony was, to my mind, a gem. Every word that fell from that woman's lips I believe was golden truth; and, if her testimony is true of the details of the conversation that she had with this man,—if what she said was true, as I believe it to have been beyond the possibility of a doubt,—then this man, Kiedaisch, the testator, was competent to execute a will; and quite aside from the testimony of anybody else, taking that witness' testimony—the young woman, Mrs. Beiser—taking her testimony as true, (and I, as I have said, believe it to be,) there could be no question in the mind of anybody but that this man was capable of making a will at the time he made this one; and I have come to the conclusion, as you see, that on all the evidence I am satisfied beyond any doubt that this decedent had capacity to make this will, and that it is entitled to probate. And I think that the testimony should satisfy

the friends and relatives of this man, who have so fairly and properly sought this contest and this inquiry. Let a decree be presented admitting the paper to probate.