| Matter of Jacobs |
|---|
| 2012 NY Slip Op 33995(U) |
| November 27, 2012 |
| Surrogate's Court, New York County |
| Docket Number: File No. 2008-1387 |
| Judge: Kristin Booth Glen |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SURROGATE'S COURT : NEW YORK COUNTY
------------------------------------------------------------------x
In the Matter of the Estate of

HERBERT JACOBS,

                                                        File No. 2008-1387

                              Deceased.

------------------------------------------------------------------x

G L E N, S.

This is a proceeding for probate in the estate of Herbert Jacobs. Decedent died on March 30, 2008, at the age of 92, leaving an estate of approximately $400,000. He was survived by his nephew Ralph, objectant herein, and his niece Sylvia who are the children of his pre-deceased sister. Decedent also had two brothers, Leo and Irwin, whose whereabouts are unknown. A GAL was appointed to represent the brothers' interests and takes no position on this motion. Under the proffered instrument, dated April 15, 2004, decedent bequeaths his entire estate, in various shares, to eight friends, including Joseph Gnesin and Morris Jacobs, the post-deceased co-preliminary executor.[1] To Sylvia, decedent left $25; nothing was left to Ralph.

The objections filed by Ralph in this proceeding allege lack of due execution, lack of testamentary capacity, undue influence, and fraud.

## FACTS

The record reflects that decedent, who never married, worked at the State Insurance Fund for more than 50 years, from 1946 to 1998. In August, 1998, he was hospitalized due to heart

---

[1] Decedent's will provides that, if either of the co-executors fails to qualify or having qualified ceases to act, the remaining executor shall serve as the sole executor. Consequently, the instant motion has been filed by Gnesin only.

1

problems, and on August 16, 1998, while at NYU Medical Center, he suffered a stroke. Immediately after his stroke, decedent's niece Sylvia began assisting him in the management of his financial affairs. Toward that end, Sylvia's son, Lance Kramer, Esq. (Ralph's counsel in this proceeding), prepared a Power of Attorney. On September 17, 1998, decedent was transferred to the NYU Rusk Institute of Rehabilitation Medicine. In February, 1999, decedent returned home assisted by a full-time caretaker and continued to receive physical therapy. Several months into decedent's recovery, decedent learned that Sylvia had used the Power of Attorney to transfer more than $300,000 in cash and securities to her own account and filed a Retirement Option Election Form with the NYS and Local Retirement System in which she selected an option that provided decedent with a reduced payment during his lifetime and a larger death benefit to her as decedent's beneficiary.

In May, 1999, Decedent received his first retirement check from the State, accompanied by a letter informing him that his retirement benefits had been calculated in accordance with the joint allowance-half option provision selected on his October 20, 1998 retirement application. Shortly thereafter, decedent retained attorney Alan Fell. On decedent's behalf, Fell wrote a letter to the State requesting a change in the option election, which was denied. Fell filed an appeal. Fell's request for a hearing and redetermination was granted and on February 5, 2004, the agency issued a decision reversing the election.

In 1999, decedent also commenced an action in Supreme Court, New York County, against Sylvia, her husband Harold, and their son Lance to recover the misappropriated assets. The transcript from those proceedings reflects that Sylvia and Lance agreed to return $275,000 to decedent and to execute an agreement waiving any right to object to decedent's will upon his

2

[* 2]

death.

At his SCPA §1404 deposition Fell testified that, following the action taken by Sylvia and her family, decedent wanted to change his October 8, 1968 will which named Sylvia as executor and sole beneficiary. The first will decedent signed after Fell began representing him was executed on July 23, 2001, and nominated "Gneisen"[sic] and Morris, as co-executors; each was also a legatee of 1/3 of the residuary estate, with the remaining 1/3 bequeathed to decedent's caretaker, Esther Jacob. Sylvia was bequeathed the sum of $25. In that will, decedent made "no other provision for Sylvia or any other member of her family for reasons best known to Sylvia and me."

In his Affidavit in support, Fell avers that, although decedent's assets remained the same, in early 2002 decedent fired Esther Jacob and sought to remove her as a beneficiary of his estate. Consequently, in a will dated February 28, 2002, decedent again nominated "Gneisen" and Morris as co-executors, but in this will, he bequeathed his entire residuary estate, in equal shares, to two charities. Sylvia was once again bequeathed the sum of $25.

By April 15, 2004, when the will here offered for probate was signed, decedent had received a lump sum payment of $175,000 from the State Insurance Fund as well as the return of $275,000 from Sylvia and her family. According to Fell, decedent determined to execute a new will because of receipt of these assets. Based on conversations that he had with decedent and with decedent's friends, some of whom worked with decedent for over fifty years at the NYS Insurance Fund, Fell also notes that decedent had not had a relationship with Ralph for many years prior to his stroke.

3

## SUMMARY JUDGMENT

On a summary judgment motion, the movant must make a "prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact "(*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). Once the movant has made a prima facie case, the burden shifts to the opposing party to provide proof establishing that there are material questions of fact that require a trial (*Zuckerman v City of New York*, 49 NY2d 557 [1980]). In determining whether such factual issues exist, the court must view the evidence in a light most favorable to the non-moving party (*see Council of City of New York v Bloomberg*, 6 NY3d 380, 401 [2006]).

## CAPACITY

While the proponent has the burden of proof on this objection, the self-proving affidavits of the two witnesses raise a presumption of capacity (*Matter of Schlaeger*, 74 AD3d 405, 406 [1st Dept 2010]). In addition, the attorney drafter's affidavit swears to decedent's testamentary capacity based on his knowledge of decedent through their long attorney-client relationship. At his SCPA §1404 examination, Fell testified that, although decedent's 1998 stroke affected his gait and his eyesight, it in no way diminished his capacity to make, understand and execute a will. In addition, decedent's actions, after the stroke, taken to recover the funds wrongly transferred from his account, powerfully demonstrate his continuing legal capacity.

Ralph argues that decedent was confused and disoriented at the time he executed the proffered will, but, to support his contention, he relies solely on the carefully edited testimony of

4

Dr. Govindan Gopinathan, a neurologist, in a March 12, 2003 hearing on the pension election.[2] In addition to a six-year temporal distance, the medical records on which Dr. Gopinathan relied indicated that at that time decedent "was taking Levaquin, a very potent antibiotic . . . which causes confusion." There is no indication that decedent was similarly medicated on April 15, 2004; all the evidence as to his condition on that, the only relevant date, is that he had full capacity. Ralph has not raised a triable issue of fact as to capacity and, accordingly, the motion for summary judgment is granted as to that objection.

## DUE EXECUTION

If an attorney-drafter supervises the execution of a will, there is a presumption of regularity that the will was properly executed (*Matter of Halpern*, 76 AD3d 429, 431 [1st Dept 2010]). In addition, a valid attestation clause raises a presumption of the will's validity (*Id.* at 431). Here, proponent satisfies his burden by both the attestation clause and by supervision by an attorney, here, the drafter Fell. The will was executed in Fell's office and bears the signatures of three witnesses, Anita Simke, a secretary, Jay H. Rick, an attorney and Fell's law partner, and Fell himself. Fell's affidavit in support of the summary judgment motion states that, because of decedent's visual disability, the entire will was read to him. The two witnesses testified that they were present when decedent signed his will; Rick recalls that, while Fell read the will aloud to

---

[2]     In that hearing, Dr. Gopinathan testified on decedent's behalf that, as Ralph quotes, after decedent's stroke in 1998, in addition to a defect in his visual field, decedent also "from then onward [developed] disorientation and confusion which has been documented on several notes by the physicians in the chart." However, a review of the decision from the administrative hearing dated February 5, 2004, demonstrates that the proffered medical testimony was based on Dr. Gopinathan's review of decedent's medical records from October 14, 1998 [when the application for service retirement was signed] to October 28, 1998 [when the retirement option election form was signed - some six years prior to execution of the will here offered for probate].

5

decedent, the latter would, from time to time, nod and state "that's correct, that's right. That's what I want."

The only evidence adduced by Ralph in support of this objection is that Simke testified that she did not have a copy of the will and so did not read along as Fell read it to decedent. She was also only "pretty sure" that the witnesses were present when the will was executed. This is insufficient to raise a triable issue of fact as to due execution and, accordingly, the motion for summary judgment is also granted as to this objection.

## FRAUD

On this motion, Ralph has apparently abandoned his allegations of fraud. Summary judgment dismissing the objections based on those allegations is therefore granted.

## UNDUE INFLUENCE

"In order to avoid a will, upon the ground of undue influence, it must be shown that the influence exercised amounted to moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist " (*Children's Aid Society v Loveridge* 70 NY 387, 394 [1877]); *see also Matter of Walther*, 6 NY2d 49 [1959]). Ralph must show not only that the person wielding such an influence had the motive and opportunity to supplant decedent's wishes with his own, but also, that he or she actually exercised such an influence (*see Matter of Fiumara*, 47 NY2d 845 (1979), *Matter of Walther*, 6 NY2d at 49). The evidence here is entirely to the contrary.

Ralph argues, with no evidentiary support, that decedent was frail, mentally incapacitated,

6

and unable to care for himself or his affairs, so that as a result he was dependent on proponent. To the contrary, Fell's 1404 testimony was that he had represented decedent since 2000, and that, although his stroke affected his eyesight and his gait, it did not diminish his intelligence, his wit or his capacity. After his stroke, upon learning of Sylvia's actions, he retained counsel to protect his interests and to recover the assets she and her family had wrongfully taken. During the period of Fell's representation he was aware that decedent had twice traveled to the Caribbean with friends. There is absolutely nothing in the record to support Ralph's claim of frailty, incapacitation and inability to care for himself.

Similarly absent is any evidence that, as Ralph claims, proponent controlled decedent's finances.

According to his (affidavit) Gnesin first met decedent in 1973 during the course of conducting business with decedent's employer. Gnesin testified that decedent executed a durable power of attorney on February 1, 2007, appointing him, Morris Jacobs, and Vincent Troianiello as attorneys-in-fact. However, Gnesin also testified that he never transacted any business on decedent's behalf because decedent handled all of his financial affairs himself. Gnesin further testified that, from the April of 1999 to decedent's death in 2008, he would visit with decedent every week to go over decedent's bills, that he would return to his office with the bills so that someone in his office could prepare invoices and checks, and that he would return the following week to decedent's apartment with invoices (which he would magnify to make it easy for decedent to read), and checks for decedent to sign. The uncontroverted testimony is that decedent was able to comprehend his business and expenses and that he was able to express his wishes as to what bills needed to be paid and how his assets were to be handled.

7

Ralph apparently relies upon the power of attorney that Gnesin held to establish a confidential relationship which would ease his burden on undue influence. However, a power of attorney does not itself rise to a confidential relationship sufficient to require explanation of a bequest, absent a showing that the principal was dependent upon and subject to the control of the attorney-in-fact (*Matter of Whitney*, NYLJ, July 21, 2009, at 34, col 6 [Sur Ct, New York County];[3] Warren's Heaton, Surrogate's Court Practice § 42-07[1]).

Here there is a complete lack of evidence as to the necessary dependence and control. Even, however, were Ralph able to demonstrate a confidential relationship with the requisite involvement in the preparation and execution of decedent's will, [3] the undue influence objection would fail. It is well settled that, even when such relationship exists, and the person alleged to have exerted undue influence secured the lawyer who drafts the will (which Gnesin did not) and attended the execution (which Gnesin also did not), if there is a viable inference that conflicts with the inference of undue influence,[4] the objection fails (*e.g. Matter of Walther*, 6 NY2d 49 [1959]; *Matter of Aoki*, 948 NYS2d 597, 603 [1st Dept 2012]). Here, there is substantial evidence that decedent had no relationship with Ralph, and every reason to disinherit Sylvia and her family; rather, the "natural objects of his bounty" were his friends of many years, of whom Gnesin was only one. Indeed it is noteworthy in rebutting any claim of undue influence by Gnesin that the

---

[3] Ralph attempts to avoid summary judgment by discrediting Gnesin's testimony that he did not convey decedent's testamentary directions to Fell, in view of Fell's somewhat contradictory testimony. However, even if Gnesin told Fell what decedent wanted, that would not change the result since Fell was decedent's chosen lawyer, Gnesin was not present at the execution of the will, and, when the will was read aloud to him, decedent clearly indicated his wishes.

[4] Because there is seldom direct evidence of the actual assertion of undue influence, proof is generally based on an inference from circumstantial evidence.

propounded will gives him substantially less than an earlier will in which he received a third of decedent's estate. There is, therefore, a viable, if not compelling, inference not only that decedent's will was the product of a fully capacitated and thoughtful man, but also that his choice of his dear friends as his beneficiaries- as he indicated to Fell- was reasonable and appropriate.

On the record submitted here, there is no evidence that decedent's volition was overborne, or that his testamentary disposition was anything other than a free, unconstrained and appropriate choice. Accordingly, summary judgment is also granted as to the objection of undue influence.

Probate decree signed.

Dated: November 27 , 2012.

_____

**SURROGATE**

9